401 A.2d 23 (1979)
STATE
v.
Gilbert RODDY and Jane B. Roddy.
No. 76-390-C.A.
Supreme Court of Rhode Island.
April 25, 1979.
*25 Nancy Marks Rahmes, Sp. Asst. Atty. Gen., Providence, for plaintiff.
Abedon, Stanzler, Biener, Skolnik & Lipsey, Milton Stanzler, Providence, for defendants.

OPINION
KELLEHER, Justice.
The defendants, Gilbert and Jane Roddy, are husband and wife. They are before us on their appeal from judgments of conviction entered after a Superior Court jury found both of them guilty of all five charges set forth in a 1973 joint indictment, specifically: unlawful possession of (1) marijuana, (2) lysergic acid diethylamide (LSD), and (3) phencyclidine (PCP); (4) unlawful possession of LSD with intent to sell the same; and (5) the maintenance of a narcotics nuisance. In their appeal the defendants (the Roddys) claim that the Superior Court erred in several respects, including the denials of both a motion to suppress evidence and subsequent motions which sought the dismissal of the indictment on the ground that the Roddys had been denied their constitutional right to a speedy trial. We shall first discuss the denials of the motion to suppress and the speedy trial motions and then go on to discuss only such additional facets of the Roddys,' appeal which merit consideration.
The motion to suppress is unique in that it is based upon a direct attack upon the credibility of the affiant whose affidavit led to the issuance of the search warrant. As will be seen, this attack will require us to detail at some length the testimony adduced at the suppression hearing.
The affiant is Wellington Ray, Jr., an inspector of the Rhode Island Division of Drug Control. He typed the affidavit, and in its pertinent parts he states as follows:
(a) at approximately 10:30 a. m. on July 29, 1973, Lieutenant William E. Janes, Jr., a Newport police officer, informed Ray that the police had received information concerning a "substantial" quantity of "contraband drugs" which was located in a dwelling occupied by Gilbert Roddy at 4 Vanderbilt Avenue;
(b) later on in the day a surveillance party consisting of Ray, Janes, and Detective Sergeant Joseph Gallagher took up a position at "a vantage point on Vanderbilt Ave." and during an hour-and-a-half period observed several "subjects," including two known drug users and distributors, entering and leaving the Roddy residence;
(c) at 7:30 p. m. on the 29th, a confidential informant whose prior information had led to an arrest and a conviction was "provided with State funds and dispatched to 4 Vanderbilt Ave." for the specific purpose of buying drugs. The informant was observed "by the above named officers" entering the Roddy home at 8:30 p. m. Ten minutes later he returned empty-handed with the news that "the occupants * * * had just depleted their supply of drugs and a new shipment was to arrive in the afternoon of the 30th";
(d) by 6:30 p. m. on the following day, July 30, the surveillance trio had contacted the informant, provided him with "state funds," and "dispatched [him) to 4 Vanderbilt Ave." The officers observed their informant entering and leaving the premises, and when they met him at 6:45 p. m., he gave them a substance which field tests indicated was marijuana;
(e) the informant reported that during his visit to the Roddy residence he had observed a sizable quantity of drugs.
*26 The suppression hearing took place in 1974 on three different days during a period of almost 3 1/2 months, to wit, May 28, July 3, and September 12. The defense presented as its first witness Lieutenant William E. Janes, Jr., a Newport police officer who in 1973 was chief of the department's Tactical Squad. Janes testified that during the spring and summer of that year his department had been keeping an eye on a novelty shop owned by Gilbert Roddy called the Way Station and located on `Broadway in downtown Newport. During his testimony Janes referred several times to the Way Station as a "head shop."[1] Janes testified that on July 29, 1973, he did contact Ray and told the inspector that he, Janes, had information from a confidential informant indicating that drugs were located at the Roddy residence. Janes told the motion justice that he had sent the informant into the Way Station on July 28, 29, and 30 for the specific purpose of buying drugs.
The informant's July 28 effort was unsuccessful, but he was told to return the following day. When the informant returned to the "head shop" at about 6:30 p. m. on July 29, he was informed that "they had run out, but that there would be more on the following day." Janes at one point in his testimony said that Ray was present on Broadway when the informant paid his July 29 visit to the Way Station, but at another point he stated that, while he was observing the goings on at the Way Station, Ray and Gallagher were a mile away maintaining a watch near the Roddy residence. Janes was emphatic as he testified that he was not part of the July 29 surveillance group that spent the better part of the afternoon watching the pedestrian traffic passing by and into 4 Vanderbilt Avenue. The only time, he said, he was "ever at Vanderbilt Avenue was the time we made the raid."
On the evening of the July 30 raid, Janes picked up the informant and the informant's wife and took them to a point near the Way Station. The informant and his wife went to the Way Station at about 6 p. m. but returned empty-handed. The informant was told by an Eddie Kelly that "the stuff wasn't there; it was at the house." Thus, the scene shifted from Broadway to Vanderbilt Avenue.
At approximately 6:45 p. m. Janes dropped off the informant at Ray's .urveillance point and left the area, taking with him the informant's wife. According to Janes, he met Ray and the informant at about 8 p. m. in a parking lot near the Newport police headquarters. The "buy" having been made, the police then began processing the paper work that led to the issuance of the search warrant. Janes stated that he had given the informant $20 for the attempted purchase on the 29th, while Ray performed this same chore on the 30th. Janes also said that while he was not sure, he did not believe that the informant entered the Roddy home on the 29th.
Other witnesses at the May 28 hearing included relatives and friends of the Roddys. Their testimony, if believed, would indicate that there was nobody home at 4 Vanderbilt Avenue on July 29 at the time the surveillance trio allegedly saw all sorts of "subjects" going to and coming from that address. The 1973 calendar indicates that July 29 was a Sunday. The Roddys supposedly spent most of that day in Connecticut visiting their respective parents, while Gilbert's brother Paul, and some of the Way Station employees spent the weekend in the state of New York, attending a Watkins Glen rock concert. Many of the witnesses also stressed that the Way Station was never opened on Sundays because it did not have the necessary license. All of this testimony was part of the effort both to counter Ray's averment about the "subjects" that were entering and leaving the Roddys' home and to contradict Janes' *27 statement that he was watching the informant going into the "head shop" on July 29.
The first defense witness at the July 3 hearing was Mary Elizabeth Ross. She told the motion justice that her husband, Jay, was Lieutenant Janes' informant. She gave her version of what occurred the night of the Vanderbilt Avenue "bust." Mary Elizabeth testified that on July 30 she, Jay, and their 2-month-old baby took a bus from Middletown and traveled to downtown Newport. There they met Janes at approximately 7:30 p. m. According to her, Janes gave her husband two $20 bills and "told him to cop 2 ounces" at the "head shop on Broadway." Mary Elizabeth and Jay entered the Way Station seeking a "buy," but they were told by "the boy behind the counter" that "there wasn't any that he knew of in the shop." The counter boy suggested that they go across the street and try the "Riverbelle." Mary Elizabeth returned to Janes, while her husband went over to the Riverbelle, bought 2 ounces, and gave the marijuana to the officer. Mary Elizabeth stated that as her husband gave the marijuana to Janes, Jay also reported that the counter boy at the Riverbelle had told him that "Gilbert had stuff at his house." The wife told the motion justice that at this point she and her husband and their baby took leave of Janes and returned to their Middletown home, where they remained for the "whole night." Mary Elizabeth also insisted that her husband could not have been at the Way Station on the evening of July 29 because at that time he was at home with her. However, she did say that Jay left the house on the 29th to call Janes, but his absence lasted a mere half hour. During cross-examination Mary Elizabeth conceded that the Roddys had done "a lot of favors for me." She also admitted that she was "afraid" of the Roddys.
Other witnesses that day included Jane Roddy. She reported that she finished her work as an operating-room technician on Monday, July 30, at 4 p. m. and arrived home at about 5:30 p. m., where she remained until 9 o'clock. She knew Jay, the informant, but stressed that he did not come into her house on that night. She also insisted that the Vanderbilt Avenue premises were completely vacant during the afternoon and evening of July 29.
Gilbert Roddy followed his wife to the witness stand. At the time of his an est he was 21 years of age and might have been classified as a dual officeholder. He was an enlisted man on active duty with the United States Navy assigned to a communications unit at the Newport Naval Training Station. He also owned and operated the Way Station. The defense attempted to depict the Way Station as an enterprise that specialized in selling novelties to Newport's tourist trade.
Gilbert acknowledged that he and. Jay had met at the Way Station a little after 8 p. m. on the 30th. Jay was seeking marijuana, but Gilbert told him he "wasn't dealing" in that substance. According to Gilbert, Jay then offered him a $20 bill and asked that he keep some of this money as a partial payment for jewelry that Jay had previously purchased. Gilbert explained that the approximately $1,400 in cash that was found on his person at the time of the arrest was to be used as a payment for his share and interest as a silent partner in a nearby motorcycle shop.
Eddie Kelly was the Way Station employee who allegedly told Jay that the "stuff * * * was at the house." Kelly testified that he had spent Sunday, July 29, in New York State attending a rock concert at Watkins Glen. He emphasized that when he came back to Newport on the evening of the 30th, it "was dark out." If Kelly was correct, Jay's conversation with him about "the stuff" never occurred.
The state began its presentation of evidence with the testimony of Lieutenant Janes. He had refreshed his memory by referring to an investigative report that he had prepared. The Lieutenant seemingly removed the veil of confidentiality when, in reply to a question asking that he trace his steps following his meeting the informant in Middletown at the Newport Creamery during the early evening of July 30, he reported: "We spoke to Jay that night and *28 decided where we were going to go * *. His wife and himself went down to the head shop on Broadway where they spoke with Eddie Kelly." From there Janes, Jay, and his wife went on to the Vanderbilt Avenue neighborhood so that Jay could meet Ray. Later, Janes and Mary Elizabeth rendezvoused with Ray, Gallagher, and Jay. After Janes had transported Jay and his wife to Middletown, the Lieutenant returned to police headquarters. He explained to the motion justice that on July 30 he had given Jay $20 in four $5 bills after making photostats of each. He made the point that although he was present while Ray was preparing the affidavit, he never read the document. The Lieutenant also explained that he was not part of the July 29 Vanderbilt Avenue surveillance party because at the time in question he and another officer were keeping a surreptitious eye on the Way Station. Janes also said that the police had "worked about seven cases that week with him [Jay], and after the last case, he [Jay] was paid and sent out of town."
As the September 12 hearing began, Jades was undergoing cross-examination. When asked to equate his May 28 testimony, in which he said that on July 29 he had supplied the informant with cash, with Ray's averment that "state funds" were used, Janes replied that he was not sure who gave the money to the informant, but he was certain "the money did come out of my desk." He attributed his uncertainty about who handled the money to the summer of 1973's case load.
The state's next witness was Leo J. Gracik, a senior inspector with the Rhode Island Division of Drug Control. He testified that he was present at police headquarters on the evening of the raid as Ray and Janes made preparations for sending the informant to 4 Vanderbilt Avenue, and that photostats of the four $5 bills were taken. The witness emphasized that the photostats were turned over to him by Ray and have remained in the custody of the Division of
Drug Control. Gracik was certain that when Ray left the station, he had the four $5 bills. Later in the evening Gracik took part in the search of the Roddy home and the Roddys' subsequent arrest. He, too, reported that the four $5 bills were part of the cash cache taken from Gilbert. Gracik was certain that he had kept the photostats while Janes and Ray went out to meet the informant. When informed by defense counsel that Janes in his prior appearance had said that he had done the photostating and kept the photostats until the raid was completed, Gracik reiterated that the photostats were turned over to him before his fellow officers left headquarters for the Vanderbilt Avenue "buy."
The final witness at the suppression hearing w,,s Ray. He stated that the four $5 bills were supplied by the Newport police and that Janes did the photostating. The photostats were then given to Gracik. On the evening of the raid, Janes and Ray met in the Vanderbilt Avenue neighborhood. The informant was then transferred to Ray's vehicle, where Ray gave the informant the four $5 bills. Ray reported that on July 29 he and Janes had worked at two locations, the Way Station and Vanderbilt Avenue. He also said that Janes was with him on Vanderbilt Avenue during the early afternoon of July 29. When asked about the absence of any photostating of the July 29 bills, Ray explained that he was of the opinion that the police "didn't have enough basis at that particular time" to seek a search warrant. Ray told the motion justice that he personally observed "Jay"[2] enter the Roddy home on the evening of July 29 and again on the evening of July 30. He also said that the marijuana purchased by Jay was furnished by Roddy's younger brother, Paul.
In challenging the denial of their motion to suppress, the Roddys direct our attention to a recent ruling in Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), where the Supreme Court recognized the defendant's right under the fourth and *29 fourteenth amendments to challenge the truthfulness of the factual assertions made in an affidavit which supports the ex parte issuance of a search warrant. The challenge can be heard at a hearing granted to a defendant who makes "a substantial preliminary showing" through an appropriate offer of proof indicating that an affiant whose affidavit supports the issuance of the warrant has included within the affidavit a false averment relating to the existence of probable cause which is made either knowingly and intentionally or with reckless disregard of the truth. A hearing is not required if, after the material which is the subject of the alleged falsity or reckless disregard is set to one side, the remaining portion of the affidavit is sufficient to support a finding of probable cause. If a hearing is in order, the defendant must prove his charge by a preponderance of the evidence. Here, even though the suppression hearing preceded the Franks ruling by about 4 years, the motion justice went far beyond the dictates of Franks.
The trial justice granted the Roddys full rein as they attempted to demonstrate Ray's mendacity. Credibility, as it usually does, played an important role in the motion justice's finding against the Roddys. They had the burden of proving their allegations that Ray's affidavit was pure perjury. Admittedly, the hearings highlighted the inconsistencies between what Ray averred and what other witnesses testified at the hearings. It is also a fact that the affidavit contains not even a single reference to the ongoing surveillance of the Way Station. The Roddys quite naturally take the position that these inconsistencies and omissions as well as the testimony of their relatives and friends support the charge of perjury. The prosecution concedes the existence of the imperfections and omissions but explains that they are attributable to the fact that Ray, Janes, their colleagues, and the informant were a busy group of individuals in late July 1973.
Here the motion justice had a choice. He could either have believed the Roddys and their witnesses, or he could have believed the police. In opting for the latter choice, the trial justice acknowledged that there were "some discrepancies" in the testimony, "but under circumstances surrounding the entire travel of investigative activity here, such are to be expected. They fail to destroy the fibre of the state's case." Obviously, the motion justice, conscious of the discrepancies, accepted Janes' explanation that his confusion concerning who went where and on what day arose from the many Jay-related "drug busts" that were taking place in the Newport area during late July 1973.
When Janes first appeared as a witness at the May 28, 1974 hearing, there was some confusion about what case was then before the court. A colloquy which ensued between the motion justice and counsel revealed that in April 1974 Gilbert Roddy had been indicted for a variety of narcotics offenses which had occurred in April 1973, some 3 months prior to the July 30 search. The 1974 indictment was the result of a State Police investigation. The May 28 bench-bar exchange made clear that motions seeking the suppression of evidence and the dismissal of the 1974 indictment were being heard by the motion justice on some of the same days that he was hearing testimony that related to the 1973 indictment. In the rescript which is presently before us, the motion justice referred to Gilbert and the testimony he gave when he appeared on September 12, 1974, to testify in support of his effort to gain dismissal of the 1974 indictment. The motion justice, in a handwritten rescript, characterized Gilbert as a "cold, clever, calculating witness, unworthy of belief." After making this characterization, the motion justice made the following notation: "(See, e. g., his incredible story (testimony 9/12/74) as to why the Gianpietro girl * * * happened to be in his house at the time of search and seizure of drugs J/27/73)."[3]
*30 In considering the denial of the motion to suppress, we must view the evidence in the light most favorable to the state and apply the clearly erroneous standard in assessing the motion justice's action. State v. Leavitt, 103 R.I. 273, 290, 237 A.2d 309, 318 (1968). With the standard of Leavitt as our guide, we see no reason to fault the action taken by the motion justice.
The Roddys next contend that they were deprived of their constitutional right to speedy trial because of the almost 34 months' delay between the arrest[4] in July 1973 and the commencement of the May 1976 trial. In considering this contention, we would stress once again that the right of speedy trial, both under our Federal and State Constitutions is a relative one, the existence of which can only be determined on an ad hoc basis. State v. Crescenzo, R.I., 375 A.2d 933, 935 (1977); State v. McDonough, 115 R.I. 383, 387, 347 A.2d 41, 43 (1975); State v. Rollins, 113 R.I. 280, 282, 320 A.2d 103, 105 (1974); Tate v. Howard, 110 R.I. 641, 648, 296 A.2d 19, 23-24 (1972).
In determining whether a defendant's speedy-trial right has been violated, we apply the four-pronged test of Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Thus, we will consider and balance: (1) the length of the delay; (2) the reason for the delay; (3) whether the Roddys asserted their right to a speedy trial; and (4) whether the Roddys have been prejudiced by the delay. However, the balancing test suggested in Wingo needs to be invoked only when the length of delay in the peculiar circumstances of the case warrants inquiry into the other factors cited.
"The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circur stances of the case."
Barker v. Wingo, 407 U.S. at 530-31, 92 S.Ct. at 2192, 33 L.Ed.2d at 117.
We shall assume that the 34-month delay in the case at bar is "presumptively prejudicial," while keeping in mind that "passage of time, standing alone, is not enough to justify a holding that the guarantee to a speedy trial has been violated." State v. Crapo, 112 R.I. 729, 734, 315 A.2d 437, 440 (1974). With a presumptively prejudicial delay of 34 months as a bench mark, we will now consider and balance Wingo's other three factors.
The state attributes the delay to the number of motions filed by the Roddys and the time required to consider them. An examination of the docket indicates that on March 16, 1974, the Roddys filed three motions. One sought a suppression of evidence, another sought a dismissal of the joint indictment because of the state's supposed failure to afford a speedy trial, and the third was a motion for a bill of particulars. On April 27, 1974, the Roddys filed a motion asking that all three prior motions be called for a hearing before the Newport County Superior Court on May 28, 1974.
*31 As noted earlier in this opinion, hearings on their suppression and dismissal motions did begin on May 28. Three days later, on June 1, the Roddys filed a supplemental motion to dismiss, as well as a notice that they were going to take Mary Elizabeth's deposition.
In February 1975, 5 months after the dismissal and suppression hearings had concluded, the motion justice filed his rescript. Following a lapse of an additional 3 months, the Roddys, on May 10, 1975, filed their first specific demand for a speedy trial. The prosecution filed its replies to the bill-of-particulars motion on January 7, 1976. Within days thereafter the Roddys filed a request asking the state to produce for defense inspection a variety of items, including confessions, tangible evidence, toxicology reports, names of potential prosecution witnesses, and their addresses. Again, on this date the Roddys also filed a motion in which they asked that the state give more responsive answers to three of their requests made in their 1974 motion for a bill of particulars. These motions were still pending when trial began on May 18, 1976.
The justices who heard the evidence adduced on the speedy-trial issue attributed some of the delay to the various motions filed by the Roddys. The motion justice said that the 4 months' lapse between the Roddys' July arrest and the November return of the joint indictment was due to the fact that the Newport County Grand Jury at its annual session met only for a few days in September 1973 and then recessed until November. The motion justice said he could not fault the Attorney General's Department for its inability to present its evidence to the grand jury at its September get-together. The motion justice also observed that he had spent a great deal of time reviewing his notes of, the hearings, studying memoranda submitted by counsel, and examining the law. The trial justice stated that he was at a loss regarding how the Roddys could demand a speedy trial and follow up the demand with requests that the state furnish them with additional information. The assistant attorney general reminded the trial justice that his department had given priority to the incarcerated defendants, who have a "statutory right to trial within a certain period of time."[5]
Whatever the state's logistical shortcomings, or what otherwise might be described as bureaucratic inefficiency, the Court in Wingo pointed out that "unintentional" delays caused by crowded dockets may be weighed less heavily against the state than intentional delays. Barker v. Wingo, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. However, we believe that the Roddys and the state must share responsibility for the delay.
Although the Roddys requested a speedy trial, the request might be considered a bit tardy. It was made just about a year before the actual trial began in May of 1976.
Finally, we must consider whether prejudice was suffered by the Roddys as a result of the delay. Prejudice may take the form of specific harm to the presentment of a defense or simply the form of personal prejudice such as the loss of employment and family or the experience of public scorn occasioned by having to stand accused for a significant period of time. Barker v. Wingo, 407 U.S. at 532-33, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. Here the Roddys were not subject to pretrial incarceration, and there is no claim that they suffered any extreme anxiety or concern. Shortly after their arrest they were allowed to return to their home state of Connecticut, where both have been gainfully employed while awaiting trial.
The Roddys claim that their defense was prejudiced by the 34-month delay because they were unable to locate two witnesses, a Michael Laphart and Eddie Kelly. Laphart and Gilbert Roddy were naval shipmates assigned to duty in Newport. Gilbert told *32 the trial justice that the Lapharts and the Roddys went out to dinner sometime after 9 p. m. on the evening of July 30, 1973. Kelly, he explained, had remained at Vanderbilt Avenue throughout the time when Jay supposedly entered and purchased his 1 ounce of marijuana. Although Roddy insisted that he had been unable to locate the whereabouts of either one of these individuals, he acknowledged that he had corresponded with Laphart at an Illinois address during Christmastime 1975. Two days after Gilbert had testified about his inability to locate Kelly, his brother, Paul Roddy, appeared as a defense witness. After telling the trial justice and the jury that the drugs found by the raiding party had been purchased by Kelly while he was attending the Watkins Glen rock concert, Paul informed one and all that Kelly was now living in the state of Hawaii on the island of Maui. At no time did Gilbert ever explain to the trial justice the extent of the effort he had made to contact Laphart and Kelly, nor did he make an offer of proof about what each party would testify had they been present. As far as Kelly is concerned, it remains a mystery whether Kelly would have been a witness even if the trial had occurred much earlier. Again, there is no assurance that had Kelly and Laphart actually been present to testify, their testimony would have been anything more than cumulative.
A review of the relevant factors indicates that although there was a lengthy delay, there is no evidence of bad faith by the state. Both the state and the Roddys share responsibility for the delay. Although the Roddys made a demand for a speedy trial, they have failed to convince us that they were prejudiced by the delay. On balance, we conclude that the Roddys were not denied their right to a speedy trial.
The Roddys first made their motion for judgment of acquittal at the close of the state's case. After it was denied, they presented evidence, rested, and then renewed the judgment-of-acquittal motion. At that point the trial justice reserved decision on the motion. Once the guilty verdicts had been returned, the motion was denied. Our review is limited to the second denial because, by presenting a defense, the Roddys waived appellate review of the first denial. State v. Distante, R.I., 375 A.2d 212, 214-15 (1977); State v. Murphy, 113 R.I. 565, 569-70, 323 A.2d 561, 563 (1974).
When a motion for a judgment of acquittal is made, the trial justice's review of the evidence is limited to that evidence which the state claims is capable of generating proof of guilt beyond a reasonable doubt. The trial justice is bound to review this particular evidence, excluding the remainder, in the light most favorable to the state, drawing therefrom all reasonable inferences which are consistent with the accused's guilt. Neither the credibility of witnesses nor the weight of evidence is before the court at that time. State v. Johnson, 116 R.I. 449, 454, 358 A.2d 370, 373 (1976); State v. Wilbur, 115 R.I. 7, 15-16, 339 A.2d 730, 735 (1975). The Roddys have consistently maintained that the motion for a judgment of acquittal should have been granted because there was no evidence which would support the inference that they "consciously possessed or intentionally controlled" the contraband seized by the police.
Examining the evidence relied upon by the prosecution to establish the possessory offenses, several relevant facts appear. The Roddys rented the premises situated at 4 Vanderbilt Avenue. At this address is to be found a Cape Code cottage having a finished basement recreation room, a first-floor kitchen, living room, and dining room, and two upstairs bedrooms, one of which was occupied solely by Gilbert and Jane. A cellophane packet containing a substantial quantity of LSD was found in the freezer compartment of the kitchen refrigerator, some forty-nine PCP pills were found on the Roddys' bedroom dresser, and a variety of marijuana known as hashish was found on the same dresser in a jewelry box. The police reported that the bedroom closet contained a variety of male and female wearing apparel, and papers bearing the letterheads of the Department of Defense, United *33 States Navy, or the Newport Hospital and containing the names of Gilbert and Jane were found in this area. While the Roddys did not have actual possession of these items at the time of the seizure, clearly the evidence to which we have referred amply supports the inference that Gilbert and Jane had "joint constructive possession" of the LSD, the PCP, and the marijuana.
In State v. Motyka, 111 R.I. 38, 40-41, 298 A.2d 793, 794 (1973), we said that "[c]onstructive possession arises where an individual has dominion or control over an object although it may not be within his immediate physical possession. * * * possession, whether actual or constructive, must be a conscious possession." Again, in State v. Gilman, 110 R.I. 207, 216, 291 A.2d 425, 431 (1972), we stressed that the necessary knowledge may be established by acts, declarations, or conduct of the accused from which an inference may be fairly drawn that he knew of the existence of the narcotics at the place in which they were found.
Furthermore, there was other evidence which would support the jury's belief that Gilbert, the entrepreneur, and Jane, the technician, were fully aware of the contraband that was found on the premises and the purpose to which it was being put. We refer to the evidence which indicates that hash pipes were found in the living and recreation rooms; that on July 29 visitors including the two known narcotics users came and went; and that Gilbert had in his possession an ample supply of cash. These factors present a sufficient evidentiary basis upon which the jury could well decide that Mr. and Mrs. Roddy were in joint constructive possession of narcotics on July 30 and that the visitors of the day before were in actuality ready, willing, and able buyers for what the Roddys had to offer.
If the Roddys are to prevail on their contention that the trial justice erred in denying their motion for a new trial, they assume the burden of persuading us that the trial justice, in his consideration of their motion, misconceived or overlooked material evidence on a critical issue or that he was otherwise clearly wrong. State v. Jefferson, 116 R.I. 124, 130, 353 A.2d 190, 194 (1976). The trial justice, in considering the motion for a new trial, is obligated to make an independent appraisal of the evidence in light of the charge to the jury. Here, the jury was told that the Roddys' guilt would be proved beyond a reasonable doubt if they believed that the evidence adduced by the state "precludes every reasonable hypothesis except that which it tends to support and is consistent with the defendants' guilt and inconsistent with any other rational conclusion." The trial justice then went on to tell the factfinders that the state was not bound to prove guilt beyond all doubt but that if it had a "real, actual substantial doubt of his guilt," acquittal was in order.
The trial itself was in many respects a rerun of the suppression hearing. Janes, Ray, and Gracik were subjected to vigorous cross-examination; the inconsistencies that were uncovered at the suppression hearing and the inconsistencies between what was said at the hearing and what was testified to at trial were paraded before the jury. Mary Elizabeth appeared to testify for the defense. Once again, she insisted that her husband did not go near the Roddys' home on the night of the raid. She also explained that the money her husband offered to Gilbert when they met at the Way Station was a $20 bill. Mary Elizabeth told the jury that the $20 bill was used to buy back the wedding ring that had been pawned to the Roddys. She did concede that on that evening she heard her husband say that the drugs were not at the Way Station but were at 4 Vanderbilt Avenue. Jane Roddy and several of her relatives repeated the story of a July Sunday spent in Connecticut. The jury also heard about the Watkins Glen rock concert.
Bernard Hincke appeared as a defense witness. He helped out at the Way Station and was one of those who went to the rock concert. One of his companions at that musical extravaganza was Eddie Kelly. According to Hincke, Kelly's purchases were limited to a "baggie" of chocolate *34 powder and a "few pills," all of which were deposited in the Roddys' refrigerator. While Hincke insisted that this was the extent of the out-of-state purchases, he did concede that the day before he testified he had told the prosecutor that there were other members of the Newport safari besides Kelly who traded in drugs at Watkins Glen.
Earlier, Inspector Gracik had testified that when he first looked at the freezer packet and saw the "brown powder," he thought it was heroin. He told the jury that at that time he thought the packet contained the largest quantity of heroin he had ever seen in 11 years of being on the job. The inspector conceded that the toxi-cologist's analysis indicated that the powder was LSD. In acknowledging his error, the inspector said, "[T]hat's why we have toxicologists."
The trial justice in a bench decision denying the new trial motion specifically rejected the testimony given by Mary Elizabeth, Hincke, and Paul Roddy.[6] He said he had no doubt that the informant had used the photostated $5 bills to purchase the ounce of marijuana and that the four $5 bills were part of the cash taken from Gilbert. The trial justice conceded the presence of the police inconsistencies but saw nothing "earthshaking" in them. Like the motion justice, he attributed the differences to the fact that the same informant had been used in the numerous drug raids that took place in Newport during the last week in July. The trial justice, in concluding his consideration of the new trial motion, remarked: "[T]he court in the exercise of its independent judgment in considering all of the evidence and the weight to be given to the evidence, testimony, exhibits, all the rest of it, finds there is more than sufficient on the record for the finding of guilty in each of the five counts and against each of the two defendants." We have carefully considered the reasons advanced by the Roddys in support of this phase of their appeal, and we find no reason to fault the trial justice's denial of the motion for a new trial.
At this juncture we think it appropriate that this court do now what it should have done before. We are talking about the continued use of the so-called "Montella" or "reasonable hypothesis" rule which has been employed in this jurisdiction whenever a trial justice is confronted with a case in which the prosecution is seeking to prove guilt solely through the use of circumstantial evidence. In such circumstances the jury has been told that a guilty verdict is not in order unless it believes that the facts and circumstances of the case, when taken together, are consistent with a hypothesis of guiltbut at the same time are inconsistent with any reasonable hypothesis of innocence. The so-called "Montella" rule was first announced in State v. Di Noi, 59 R.I. 348, 368, 195 A. 497, 506 (1937), and repeated in State v. Blood, 68 R.I. 160, 162, 26 A.2d 745, 746 (1942).
The "reasonable hypothesis" rule really took hold in this jurisdiction in State v. Montella, 88 R.I. 469, 476, 149 A.2d 919, 922-23 (1959). There, officials at a Providence polling place were indicted and charged with conspiring to violate the election laws. The evidence indicated that on election day somebody dumped hundreds of paper ballots into the ballot box. This court, in sustaining the defendants' appeal, relied upon the "reasonable hypothesis" rule. In Mon tella the evidence clearly indicated a conspiracy. However, there was no evidence which would indicate the identify of the actual conspirators. Since each defendant was presumed innocent, all four on the record compiled by the prosecution were entitled to an acquittal.
In 1954 the United States Supreme Court in Holland v. United States, 348 U.S. 121, 139-40, 75 S.Ct. 127, 137-38, 99 L.Ed. 150, 166-67 (1954), in relying on the premise that the probative force of circumstantial evidence is equal to that of direct evidence, rejected the "reasonable hypothesis" rule as being "confusing and incorrect." The Court ruled that when a jury is properly instructed on the standards of reasonable *35 doubt, there is no need to talk in terms of multiple hypotheses. We have referred to the Holland case in State v. Fortes, 110 R.I. 406, 409 n.2, 293 A.2d 506, 508 n.2 (1972), and the fact that federal courts no longer speak to the jurors about hypotheses. A year later in State v. Rose, 112 R.I. 402, 407, 311 A.2d 281, 284 (1973), this court ruled that there is no valid distinction to be drawn between the probative force of direct and circumstantial evidence. In State v. Aurgemma, 116 R.I. 425, 435 n.6, 358 A.2d 46, 52 n.6 (1976), we spoke of the anticipation that someone would ask that we review the viability of the "Montella" rule. Anticipation never became a reality. Thus it is that we think the time has come when we abandon "Montella."
While other jurisdictions may adhere to the special instructions, the better rule is that in situations in which a jury is properly instructed on the standards for reasonable doubt, an additional instruction on circumstantial evidence is confusing and incorrect. Holland v. United States, 348 U.S. at 139-40, 75 S.Ct. at 137-38, 99 L.Ed. at 166-67. The rationale for this rule is obvious:
"Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."
Id. at 140, 75 S.Ct. at 137-38, 99 L.Ed. at 166-67.
In recent years a growing number of state jurisdictions have embraced the rationale of Holland and rejected the necessity of charging the jury concerning the weight to be given circumstantial evidence[7] Having said in State v. Rose, 112 R.I. at 407, 311 A.2d at 284, that the probative values of direct and circumstantial evidence are similar, there is no logical, sound reason to continue to draw distinctions about the weight to be assigned to each. This court now feels that it is time to discard the "Montella" rule. A proper instruction concerning reasonable doubt, when applied to all kinds of evidence, gives the jury a proper standard on which to make a determination of guilt or innocence. To instruct further on the probative force of circumstantial evidence is to compound semantic confusion. We now hold that an instruction on circumstantial evidence which cautions a jury that a defendant should not be found guilty unless the facts and circumstances proved exclude every reasonable hypothesis of innocence is unnecessary and should not be given.
The final phase of this appeal revolves around the Roddys' contention that the trial justice erred as he ruled on various matters. Few of the rulings merit discussion. None of them present cause for reversal.
The defense asked that we change the law relating to the use of prior inconsistent statements. In State v. Bowden, 113 R.I. 649, 661, 324 A.2d 631, 639 (1974), we alluded to the principle that such statements are admissible not for their substantive or independent testimonial value but only for the purpose of impeaching or neutralizing the at-trial testimony. We reaffirmed this principle in State v. LaPlume, R.I., 375 A.2d 938, 942-43 (1977), and we see no reason to take a contrary position.
*36 The Roddys, in challenging the toxicologist's identification of the various drugs seized during the raid, contend that the prosecution failed to establish the requisite chain of custody alluded to in State v. McCartin, 106 R.I. 674, 262 A.2d 826 (1970). Such a continuity, we said, acts as a guarantee against the threat that someone might have tampered with the evidence. Notwithstanding the Roddys' assertions to the contrary, the record clearly demonstrates that the prosecution proved the requisite chain of custody as the contraband made its way from Newport to the Providence headquarters of the Division of Drug Control to the division's toxicology section, and back to Newport for the suppression hearing and the trial. We would note that the prosecution is not required to exclude all possibility that a proposed exhibit has been the subject of tampering. All that is required is the demonstration of a reasonable possibility that the proposed evidence is in substantially the same condition, when offered as an exhibit, as it was when the crime was committed. The record indicates that the dictates of McCartin were well satisfied.
The trial justice consistently rejected the Roddys' effort to introduce into evidence a wallet-sized photograph of a longhaired male holding a rabbit in his exquisitely tattooed forearms. Mary Elizabeth testified that she took the picture and the rabbit fancier was her husband. After the prosecution's objection to defense counsel's showing of the picture to Sergeant Gallagher had been sustained, an offer of proof was made. In this offer the defense contended that if the Sergeant had been permitted to answer the question, it believed that he would have answered that the person in the photograph was not the individual who left the premises at 4 Vanderbilt Avenue after purchasing 1 ounce of marijuana on the evening of July 30. Later, Inspector Ray was shown the picture, and the prosecution's objection to the use of the photograph was again sustained.
The trial justice sustained the objections on his belief that Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), barred any revelation of the informant's identity. In taking this position, the trial justice misconceived the reach of Roviaro. As we pointed out in State v. Cofone, 112 R.I. 760, 765, 315 A.2d 752, 755 (1974), Roviaro recognized the need for preserving an informant's identity but said that such a need must be balanced against the accused's right to a truthful verdict, especially in cases in which the informant is a witness to the crime or can offer information which is both "relevant and helpful" to the determination whether the accused committed the crime charged. Roviaro itself also makes quite clear that the government's privilege to refuse to disclose the identity of an informant ceases to exist once the defendant otherwise learns of the identity of that informant. However, Roviaro affords no support for the exclusion of the photograph because the Roddys were well aware that Jay was the one who was supplying the police with information about their trafficking in drugs. There is ample evidence in the record to support the Roddys' assertion that one of Jay's specific tasks in late July 1973 was to obtain the evidence which would lead to their arrest.
As noted earlier, Janes and Ray at various times during the suppression hearing[8] referred to the informant by the name "Jay." In fact, during his July 3, 1974, cross-examination, Janes went one step further:
"Cross Examination by Mr. Stanzler:
"47 Q Mr. Ross told you, did he not, that he made no purchase at the Way Station on the night of the 30th, didn't he?
A Yes, he did.
"48 Q That he made no purchase? A That's right.
"49 Q And he had the $20. when he came back to the car, according to you; isn't that so?

*37 A Yes, he did.
"50 Q He had the same $20.?
A Yes."
At the trial Janes testified that on one of the evenings when he picked up the informant for the purpose of making a buy from the Roddys, the informant was accompanied by "a female" who in turn had brought "a child" with her. Janes was not sure whether the female and the child showed up on July 29 or on July 30.
Consequently, the issue to be resolved is whether the trial justice's erroneous exclusion of the photograph and its use requires a new trial. The answer is, "No."
Our negative response is prompted by our acceptance of the state's argument that the exclusion, if erroneous, was harmless. In dealing with erroneous exclusions of evidence offered by a defendant, we examine the record to determine if it can be said with reason that the excluded evidence would have altered the result. State v. Gamerlin, 116 R.I. 726, 731, 360 A.2d 862, 865 (1976). In assessing the potential impact of the excluded evidence, we must of necessity first look at the nature and quantum of proof of the Roddys' guilt.
The evidence presented by the state indicates that the goings on at the Roddy home were not the goings on one would expect to observe in the average Cape Code cottage. In their search, the police found "LSD" in the kitchen refrigerator, "PCP" and "hash" in the Roddys' bedroom, and "grass" in the living room. The police also came across such drug-related items as "pipes," "rolling machines," "papers," and a sheet of paper called an "acid blotter" containing "fourteen spots" of "LSD." On the recreation room's bar was a hash pipe which was being used by one of the three individuals who were present in that location. A second individual was George Mangeritis. George was well known to the police. A search of his person uncovered a "tab" of "suspected LSD."
The jury was told how the informant was searched for cash and drugs before he entered the Roddy home. The results of that search were negative. The informant then was given the four photostated $5 bills. He entered the premises at 4 Vanderbilt Avenue, and within a matter of minutes he came out on the street bearing an ounce of marijuana. Later on, when Gilbert was searched, he had on his person more cash than the average Rear Admiral would be expected to carry. Part of Gilbert's cash was the four photostated bills that were originally given to the informant.
Other evidence supporting the state's case came from the lips of Mary Elizabeth. During cross-examination she made it clear that she was well aware that her husband's mission on the evening of July 30 was to "set up" her friends, Gilbert and Jane. Mary Elizabeth left no doubt in the jury's mind that on the evening of July 30 the police had received information from a reliable, if not confidential, informant that there was contraband at the Roddys' home. This was accomplished when she conceded to the prosecutor that before she, her spouse, and child left the Way Station area for her family's alleged return bus trip to Middletown, Jay, in her presence, told Lieutenant Janes that the drugs were not at the Way Station but at 4 Vanderbilt Avenue.
As will be seen, Mary Elizabeth's detailing of Jay's July 30 cash supply helped the prosecution rather than her friends. According to Mary Elizabeth's tally, at one point during the evening of that day Jay had on his person the total sum of $65. Forty dollars of this amount were the two $20 bills which she claimed were to used to "purchase two ounces of marijuana from the Way Station," but which, she said, were spent across the street at the Riverbelle. The jury became acquainted with another facet of Gilbert's interests when Mary Elizabeth testified that after Jay had returned to the Way Station following his purchase at the Riverbelle, he gave Gilbert $20 so that Mary Elizabeth could redeem her wedding *38 rings. Mary Elizabeth explained that Gilbert was playing the part of the pawnbroker because Jay "had pawned my rings, my wedding rings," and "Gilbert was holding them." During cross-examination Mary Elizabeth told the jury that Jay, in redeeming the rings, gave Gilbert a $20 bill. Mary Elizabeth at this point made it quite clear that no $10 or $5 bills were used to redeem her rings.
While the Roddys offered an explanation for the presence of some, if not all, of the drugs found in the house, their explanatory defense missed with Mary Elizabeth. When she insisted that Jay had redeemed the pawn with a $20 bill, she obliterated any possibility that the defense might claim that Gilbert came into possession of the photostated bills because Jay had used them to redeem his wife's wedding band.
Actually, the photograph was being used to corroborate[9] Mary Elizabeth's insistence that her husband was at the family hearth at the time when he was supposedly at the Roddys' front door prepared to make a buy. The presentment of the photograph to the police witnesses raises the possibility of two answers. Officer Ray's testimony demonstrated one. He did not recognize the subject. Gallagher, if allowed to answer, conceivably might have produced the second. He might have recognized and identified the subject as the person who delivered the 1 ounce of marijuana to the surveillance party. Such a recognition would have nullified all of Mary Elizabeth's "at home" testimony. An officer's nonrecognition could conceivably be caused by several reasons, including a poor memory, poor eyesight, a change in the subject's appearance, a reluctance to identify the informant, especially when the trial justice has invoked a rule of absolute privilege, or the subject portrayed was not the individual who made the buy.
The impact of the photograph on the evidence presented by the state is so speculative as to be nil. We are of the opinion that the admission of the photograph would have done nothing to reduce the impact on the jury's mind of the unexplained presence of the four photostated bills found in Gilbert's pocket. These four bills, three of which[10] are in evidence, stand as mute, compelling, convincing evidence indicating that someonemost probably Jaybut, if not him, then somebody else, at the request of the now reliably informed police, entered the Roddys' home, purchased an ounce of marijuana, and paid for it with the four bills furnished by the police. In the light of all these circumstances, we are convinced that the exclusion was harmless error.
The defendants' appeal is denied and dismissed, the judgments of conviction entered in the Superior Court are affirmed, and the case is remanded to the Superior Court.
NOTES
[1] A "head shop" is an establishment that deals, at least in part, in paraphernalia that might be of use to members of the drug culture. An example of what might be purchased there is a "hash" pipe, a device that, not surprisingly, can be used to smoke hashish, which is a form of marijuana consisting of the resin scraped from the plant's leaves. It is far more potent than crude marijuana. Also available are rolling papers, indispensable to those who prefer their own version of either conventional or marijuana cigarettes.
[2] It is obvious that Ray, like Lieutenant Janes, might have disclosed the identity of the informant because during his testimony he referred to his informant as "Jay."
[3] Interestingly enough, Gilbert's motion for a dismissal of the 1974 indictment and the suppression of evidence in that case was granted. The dismissal was based upon the state's failure to explain the almost-a-year delay between the April 27, 1973 arrest and the return of an indictment in early April 1974. The motion to suppress was granted because of a warrantless search which was conducted by the State Police. An examination of the written rescript filed by the motion justice in the 1974 case makes it clear that he was not convinced that Gilbert Roddy had consented to the search of his home.
[4] The "arrest" or "accusatory stage" constitutes the starting point for determining whether a defendant has been denied the right to a speedy trial. Dillingham v. United States, 423 U.S. 64, 65, 96 S.Ct. 303, 303-04, 46 L.Ed.2d 205, 207 (1975). In State v. Palmigiano, 111 R.I. 739, 741, 306 A.2d 830, 832 (1973), and Tate v. Howard, 110 R.I. 641, 648, 296 A.2d 19, 24 (1972), we measured the length of delay from the date of the indictment. In State v. Crescenzo, R.I., 375 A.2d 933, 937 (1977), the defendant sought to use the Dillingham rule as a basis for showing preindictment prejudice. We distinguished Dillingham on the basis that Dillingham had been arrested 22 months before he was indicted, while in Crescenzo the first prosecutorial move was the return of a secret indictment.
[5] The prosecutor was apparently referring to G.L. 1956 (1969 Reenactment) § 12-13-7, as amended by P.L. 1974, ch. 118, § 12, which in essence provides that a person charged with treason against the state, murder, robbery, rape, arson, or burglary shall, if the accused demands a trial, be tried or bailed within 6 months after the entry of the not guilty plea.
[6] Paul attributed the presence of hash to Kelly's rock-concert purchases.
[7] Allen v. State, 420 P.2d 465, 468 (Alaska 1966); State v. Harvill, 106 Ariz. 386, 391, 476 P.2d 841, 846 (1970); Murray v. State, 299 Ark. 887, 895, 462 S.W.2d 438, 442 (1971); People v. Bennett, 183 Colo. 125, 515 P.2d 466, 469-70 (1973); Henry v. State, 298 A.2d 327, 330 (Del. 1972); State v. Bush, Haw., 569 P.2d 349, 351-52 (1977); State v. Wilkins, 215 Kan. 145, 156, 523 P.2d 728, 737 (1974); State v. Cowperth waite, 354 A.2d 173, 179 (Me.1976); Bailey v. State, Nev., 579 P.2d 1247, 1249 (1978); State v. Ray, 43 N.J. 19, 31, 202 A.2d 425, 432 (1964); State v. Rockwell, 86 Wash.2d 393, 394-95, 544 P.2d 1250, 1251 (1976); Blakely v. State, 542 P.2d 857, 862 (Wyo.1975).
[8] We should point out, if it is not obvious by now, that the justice who presided at the 1974 suppression hearing did not preside at the 1976 trial. Likewise, the trial prosecutor was not the state's representative at the suppression hearing.
[9] When the photograph was sought to be introduced during the Roddys' cross-examination of Gallagher and Ray, Mary Elizabeth had not yet testified that on the evening of July 30 her husband had accompanied her home after their sojourn at the Way Station.
[10] When the Internal Revenue Service heard of Gilbert's ready cash supply, it contacted the Division of Drug Control and, with the Roddys' consent, laid claim to the $1,400+. The state was to keep the four identifiable bills. Somewhere along the line, when the division examined the four bills it retained, it discovered that one of the four was not one of the photostated bills. By the time the Internal Revenue was notified, the seized money, including the fourth bill, was back in circulation. Consequently, only three of the identifiable bills were available to be admitted into evidence.