STATE

v.

**Dorothy M. BULHOES.**

**No. 80–152–C.A.**

Supreme Court of Rhode Island.

June 25, 1981.

Dennis J. Roberts, II, Atty. Gen., Kathryn Ann Panciera, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Dale G. Anderson, Asst. Public Defender, for defendant.

## OPINION

KELLEHER, Justice.

This two-count criminal information was filed by the Attorney General on May 22, 1979, against Dorothy Bulhoes (Dorothy) and her son, Michael Bulhoes (Michael). It charged that the mother and her son had on or about January 28, 1979, maintained a narcotics nuisance that was used for the unlawful sale, use, and keeping of a controlled substance, to wit, Lysergic Acid Diethylamide (LSD) and amphetamines and that they had in their possession a controlled substance, to wit, LSD. Michael also was charged with possession of amphetamines. However, this charge was dismissed on the motion of the Attorney General pursuant to Super.R.Crim.P. 48(A) when it appeared that the amphetamines were diet pills once prescribed for the mother. Michael pleaded guilty to both counts,

but his mother elected to go to trial; and on September 21, 1979, a Superior Court jury returned guilty verdicts to both charges. This appeal followed from the trial justice's refusal to grant a motion for a new trial.

The record reveals that Domenic Capalbo (Capalbo), Senior Narcotics Inspector of the Rhode Island Division of Drug Control, as a result of information supplied by a confidential informant, applied for and received from the District Court a warrant to search the Bulhoes residence, located in Tiverton, Rhode Island, for marijuana, amphetamines, and drug paraphernalia. The warrant was executed on the evening of January 28, 1979, by members of the Division of Drug Control and the Tiverton police department.

Capalbo testified that he, Inspector Norman A. Phelps (Phelps) of the Division of Drug Control, and members of the Tiverton police department gathered outside the Bulhoes residence at approximately 7 p. m. on January 28, 1979. Capalbo instructed Phelps, who was not in uniform, to knock on the front door and to ask for Michael in order to gain entrance into the house without having to "knock any door down." Phelps did as he was told and was allowed inside by Michael's younger brother. Moments later, Phelps was joined by Capalbo and a detective from the Tiverton police. According to Capalbo, when he entered the house, he observed Phelps "sparring with Mrs. Bulhoes who had a butcher knife and attempted to stab him [Phelps] a number of times." After the intruders had identified themselves as police officers, Dorothy joined her husband and the rest of the family in the living room.

Capalbo told the family that he had a search warrant, and then he proceeded to search the residence for the items specified in the warrant. Capalbo and Detective Peter Dias (Dias) went to the parents' bedroom, where a search of Dorothy's bureau resulted in the discovery of "a plastic baggy containing forty pink tablets" later identi-

fied as LSD and a box containing what Capalbo characterized as drug paraphernalia.[1] Phelps searched Michael's bedroom and reported finding six tablets similar to those found in Dorothy's room.

After discovering the tablets, Capalbo went into the living room to advise Dorothy and Michael that they were under arrest. At this time, Capalbo reported, Dorothy apologized for attacking Phelps but explained that the attack resulted from the fact that someone had entered the house a few weeks earlier posing as a police officer and had stolen a pound and one-half of marijuana.

Phelps testified and generally corroborated Capalbo's version of the events. He stated that he approached the house alone, knocked on the door, and asked for Michael. When Michael came to the door, Phelps identified himself as a police officer, displayed his credentials, and said he had a search warrant for the house. It was at this point, according to Phelps, that Dorothy started screaming, ran into the kitchen, picked up a butcher knife, and began waving it at Phelps. Phelps stated that when he drew his automatic, Dorothy put down the knife and joined the rest of the Bulhoes clan in the living room.

Four of the Bulhoes clan testified. David told the jury that he answered the door and went to get Michael at Phelps's request. He disputed the claim that his mother had attacked Phelps. According to his recollection, the family had just finished dinner, and his mother was in the kitchen preparing to pass out the dessert. He also testified that he could not recall his mother's apologizing to the officers after she was placed under arrest, nor did he recall her mentioning any prior robbery involving marijuana.

Michael took the stand and testified to his recollection of the events. According to Michael, when he arrived in the kitchen, the remaining portion of the raiding party was beginning to enter the house. Michael stat-

1. The box contained "a number of marijuana pipes, two scales, cigarette paper, commonly used for smoking marijuana, * * * plastic bag- gies, lunch baggies, a box of them and sifting material used in the drug scene to sift marijuana."

ed that two members of the search party took him into his bedroom and told him "[t]hey wanted everything" and that if he didn't cooperate, "they were going to bust my head." Consequently, Michael turned over approximately thirty tablets of LSD and a scale.

In her appearance on the witness stand, Dorothy insisted that she did not see Phelps until he came into the kitchen and told her to move into the living room. She denied threatening him with a knife or waving it at him in any fashion. She also denied apologizing to Phelps or conceding that she had been a victim of a robbery involving marijuana. Dorothy denied ever seeing, prior to the evening in question, the LSD tablets found in the bureau. Another witness acknowledged that Dorothy had had a knife in her hand but explained that the instrument was being used to cut up the dessert, which was a pie.

Before us, Dorothy argues that the trial justice erred by failing to grant a motion for judgment of acquittal as it related to the narcotics-nuisance charge. General Laws 1956 (1968 Reenactment) § 21–28–4.-06(1)(a).[2] Dorothy predicates her argument on the theory that in defining nuisance, the Legislature intended to retain its common-law meaning.

We recently addressed this very issue in *State v. Reis*, R.I., 430 A.2d 749 (1981). In that case we were confronted with a situation in which the defendant had been convicted of both possession with intent to deliver and maintaining a narcotics nuisance. The evidence adduced at trial did not establish that Reis had used his car or his apartment, a search of which produced controlled substances, for the unlawful sale or keeping of controlled substances. In *Reis*, we vacated the conviction of maintaining a narcotics nuisance. We ruled that "the Legislature intended the words 'common nuisance' to have their common law meaning and that such meaning contemplates acts which are recurrent or of an

habitual nature." *State v. Reis*, at 753. Accordingly, we ruled that conviction of maintaining a nuisance could not stand when the evidence showed only an isolated act of possession.

■ The factual setting in the instant case is virtually identical to that in *Reis*. The state was able to establish only that a single sale had occurred at the Bulhoes residence. Moreover, that transaction involved marijuana, whereas in this information the nuisance involved the sale and possession of LSD and amphetamines. We need only repeat the language of the Maryland Court of Appeals to demonstrate that such evidence is legally insufficient to sustain the charge of maintaining a narcotics nuisance. "[P]roof * * * of a single day's violation was legally insufficient to permit the case to go to the jury." *Skinner v. State*, 16 Md.App. 116, 129, 293 A.2d 828, 836 (1972). According, we hold that the evidence presented in the instant case falls far short of that necessary to sustain a conviction on the nuisance charge.

The next issue relates to Dorothy's claim that the trial justice violated her constitutional right to confront her accusers. To put this claim in its proper perspective, a brief resume of what occurred at trial is in order. At no time did Dorothy ever challenge the issue of probable cause for the issuance of the search warrant. No motion to suppress was made, and four months after the return of the information Dorothy was on trial before a Superior Court jury. The only pretrial motion presented was Dorothy's request for a speedy trial.

The first prosecution witness was Capalbo. He told the jury that on January 23, 1979, he received a phone call from a reliable confidential informant. He then proceeded to tell the jury that the informant told him that Dorothy and Michael were "actively engaged in selling drugs from their house." Capalbo also informed the

---

**2.** General Laws 1956 (1968 Reenactment) § 21–28–4.06, as enacted by P.L.1974, ch. 183, § 2 states, in part:

"Any store, shop, warehouse, building, vehicle, aircraft, vessel or any place whatever which is used for the unlawful sale, use, or keeping of a controlled substance shall be deemed a common nuisance."

jury that early in the evening of the following day, January 24, he and Dias met the informant and gave him $40 of state funds. The jury listened as Capalbo explained how the informant went into the Bulhoes residence and returned minutes later with one ounce of marijuana and no cash. Capalbo described a third meeting with the informant which took place on January 25, 1979, at which time the informant paid a return visit to the Bulhoeses and confirmed that drugs were still in the house. When the time arrived for cross-examination, Dorothy's counsel immediately asked Capalbo for the name of his confidential informant.

The trial justice sustained the prosecutor's objection and told the sheriff to escort the jury out of the courtroom. After the jury had departed, the trial justice observed that the sole purpose for the reference to the informant was to establish probable cause for the issuance of the warrant. When the jury returned, it was told by the trial justice that the testimony concerning the informant was relevant on the issue of whether the police had probable cause to enter the Bulhoes property. Later, in the final portion of his charge to the jury, he alluded to the evidence concerning the informant's activities and said that the evidence was relevant as to whether the police were lawfully upon the premises.

Dorothy claims that the trial justice, by permitting Capalbo to testify concerning what the informant did and saw, violated her Sixth Amendment right of confrontation. The state claims there was no such violation, but if there were such a violation, the trial justice's repeated explanations regarding the purpose of this evidence cured any error.

As noted earlier, probable cause for the issuance of the search warrant was never an issue in this case. If it were, the determination of probable cause was a question directed to the trial justice, not the jury. The only direct evidence concerning what was going on within the Bulhoes residence during the period alluded to in the information came from the reports of the informant.

Recently, in *State v. Souza*, R.I., 425 A.2d 893 (1981), we had occasion to examine the extent to which the right of confrontation may be required within the context of a confidential-informant situation. We pointed out that society's need for a free flow of information to law-enforcement authorities must be balanced against an accused's right to present a defense to the crime charged. The fact that the informant was either a participant in the criminal conduct under consideration or was present at the scene of the alleged crime was to be considered a significant factor in the decision to require disclosure. Finally, because there is no fast rule concerning when disclosure is required, the trial justice should take into consideration the crime charged, the possible defenses, and the possible significance of the informant's testimony. *See also Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); *State v. Roddy*, R.I., 401 A.2d 23 (1979); *State v. Cofone*, 112 R.I. 760, 315 A.2d 752 (1974).

■ Here, we think it significant that the informant's testimony and activities constitute the only direct evidence involving Dorothy with the crimes charged. It was her contention, both at trial and at sentencing, that she was totally unaware of the presence of the LSD in her drawer or of her son's involvement with the illicit drug trade. In balancing the pertinent considerations, alluded to in *Souza*, we are of the opinion that on balance her request for the name of the informant should have been granted.

■ We now turn to the state's claim that the trial justice's admonitions to the jury cured any prosecutorial "goof" because the jury had harkened to the trial justice's exhortations that Capalbo's testimony about the informant's activities was to be considered solely on the issue of probable cause for the issuance of the search warrant. In assessing the adequacy of the trial justice's admonitions, we must review his remarks in the context of how they would be construed by a jury composed of ordinary, intelligent lay persons. *State v. Ro-*

*balewski*, R.I., 418 A.2d 817, 821 (1980); *State v. O'Rourke*, R.I., 399 A.2d 1237, 1240 (1979).

██ Applying this standard to the trial justice's instructions, we find that immediately after the defense sought the identity of the informant, the jury was told that the references to the informant related only to the existence of probable cause. Although the jury was told that "[t]he truth of the assertion of what the confidential informant gave is not before you. * * * What the confidential informant told this police officer * * * is not an issue in this case at this time," at no time was the jury told in plain, simple, everyday English to disregard that portion of Capalbo's testimony which related to the informant's words and deeds. Any possibility that the jury was on the same wave-length as the trial justice and would limit its consideration of the informant's role solely to the nonissue of probable cause was completely dissipated when in his final references to the statements made by the informant, after repeating much of what he had said earlier, he admonished the jury that evidence of what the confidential informant said was not before it as "substantive evidence" and then told the jury that "[e]vidence of anything that the confidential informant did in relation to the home and in relation to maintaining a narcotics nuisance charge, you may consider in light of the totality of experiences but not what he said, not what he told Inspector Capalbo." Since the police had no personal knowledge of what actually happened on the two occasions when the informant supposedly checked out the Bulhoes home, the jury was told that proof of what the prosecution charged could be established by the actions of an unknown individual who should have been subjected to cross-examination.

In summary, we believe that the trial justice, try as he did, has failed to eradicate the taint of the inadmissible hearsay; consequently, a new trial is in order on the issue of Dorothy's alleged possession of LSD.

The defendant's appeal is sustained, the judgment of conviction appealed from is vacated, and the case is remanded to the Superior Court.