**STATE**

v.

**Salvatore ROMANO.**

**No. 81–130–C.A.**

Supreme Court of Rhode Island.

Feb. 21, 1983.

Reargument Denied March 24, 1983.

Dennis J. Roberts, II, Atty. Gen., Melanie Wilk Spencer, Asst. Atty. Gen., for plaintiff.

Griffin & Higgins, Kirk Y. Griffin, Geline W. Williams, Andrew P. Hier, Boston, Mass., John A. O'Neill, Jr., Providence, for defendant.

## OPINION

KELLEHER, Justice.

This appeal is a sequel to the events described in *State v. Barton,* R.I., 424 A.2d 1033 (1981), R.I., 427 A.2d 1311 (1981) (reargument denied), where we affirmed the Superior Court conviction of Ronald F. Barton (Barton) and James Murphy (Murphy) on charges that they (1) conspired with several codefendants, including one Anthony Fiore (Fiore), to break into and enter the Lincoln, Rhode Island, manufacturing plant of Vennerbeck & Clase, Inc. (Vennerbeck); (2) possessed burglary tools; and (3) maliciously destroyed communication lines belonging to New England Telephone Company.

In *Barton* the court alluded to a lengthy, ongoing, highly sophisticated surveillance, during the spring of 1977 by members of the Rhode Island State Police (State Police) and the Federal Bureau of Investigation (FBI), of Fiore and Barton and several other individuals as they went about proceeding to execute a plan to steal from Vennerbeck its inventory of precious metals which at the time had a value in excess of $1 million.

The conspiratorial endeavor went awry at approximately 11:15 p.m. on May 30, 1977, when Murphy, after hearing one of his colleagues report by radio that "we've got a problem here. Go back," ran from an open manhole cover in front of Vennerbeck's plant directly into the arms of three FBI agents who had secreted themselves nearby. Sometime after midnight but before 1 a.m.

of May 31, Barton was arrested at gunpoint as he attempted to back his Pontiac sedan down a driveway onto Rolling Woods Drive. The driveway was part of the premises situated at 1 Rolling Woods Drive. At this particular time, the driveway was also serving as a parking area for two other vehicles, an Oldsmobile Cutlass and a Dodge van.

When the police knocked on the door and rang the front-door bell at 1 Rolling Woods Drive, they were met by Salvatore Romano (Romano), a member of the Rhode Island Bar. He is before us on his appeal from his conviction on five of the six counts laid out in an indictment·that was returned by the grand jury for Providence and Bristol Counties in late October 1979.

The Superior Court jury returned guilty verdicts on charges that Romano had (1) conspired with Fiore, Barton, Murphy, and other individuals to break into Vennerbeck's plant; (2) maliciously destroyed telephone lines; (3) and (4) possessed stolen property, to wit, two walkie-talkies belonging to a Massachusetts newspaper and two other walkie-talkies belonging to a Pawtucket scrap-metals dealer; and (5) committed perjury when he testified as a prosecution witness at the Barton-Murphy trial. However, the jury did acquit Romano of a charge that he had possessed burglary tools.

In his appeal,[1] Romano raises a variety of issues which, when grouped, relate to (1) Romano's effort to dismiss the indictment, (2) the trial justice's refusal to sever the perjury count, (3) the sufficiency of the evidence, and (4) the charge to the jury. We shall consider each group seriatim.

### Dismissal of the Indictment

The dismissal-of-the-indictment facet of Romano's appeal centers on three motions, one of which sought the dismissal of the indictment on the ground of alleged prosecutorial misconduct by Attorney General Dennis J. Roberts II, another of which

asked that the trial justice recuse himself from consideration of the prosecutorial-misconduct motion because he had a longstanding personal, social, professional, and business relationship with the Attorney General and the Attorney General's uncle, a former Governor of Rhode Island, Dennis J. Roberts, and the third of which sought a dismissal because of an allegedly unconstitutionally composed grand jury.

### a. Prosecutorial Misconduct

■ To put Romano's claim of prosecutorial misconduct in its true perspective, we shall briefly refer to some of the events that preceded the return of the indictment now before us. Our source of reference is a front-page story published by the Providence Evening Bulletin on the afternoon of October 10, 1979, with a page-wide headline reading, "ROBERTS HALTED INDICTMENT OF LAWYER."[2]

Romano had testified for the state at the February 7, 1979 trial of Barton and Murphy. At that time he insisted that he knew nothing about the aborted break and had no idea who had placed a substantial quantity of burglary tools in his garage. The presence of two cars and a van in his driveway was of no consequence to him because it was "not unusual for me to have cars in my driveway." "It's a large garage," he reported, "and it's not uncommon for me to have clients coming by at various hours."

After the Barton-Murphy trial had concluded, the justice who presided at that trial, Mr. Justice Joseph F. Rodgers, Jr., wrote to the Attorney General and suggested to him that the Attorney General's department investigate the possibility of Romano's having committed perjury when he testified for the state. At the time of trial, Romano was serving as legal counsel to the judiciary committee of the Rhode Island Senate. After accepting the trial justice's suggestion, the Attorney General notified

---

1. Romano has been suspended from the practice of law pending the determination of his appeal. *Carter v. Romano,* R.I., 426 A.2d 255 (1981).

2. Copies of the news stories to which we refer in this opinion are attached to the Motion to Dismiss.

the judiciary committee chairman that its counsel was a "potential target of a grand jury investigation." The chairman in turn notified one of Romano's law partners of the impending investigation. The partner then conferred with the Attorney General with the express purpose of effecting a change of mind by the Attorney General. However, the partner was told that although Romano's involvement or lack of involvement with the attempted break-in was going to be presented to the grand jury, the Attorney General promised that at the time the Vennerbeck episode came before the grand jury, Romano would be free to come before the panel and present his side of the story.

On May 23, 1979, the Attorney General was out of the state attending a meeting of the National District Attorneys Association while one of his assistants, who was totally unaware of the agreement reached with Romano's law partner, was presenting the issue of Romano's involvement to the grand jury. When the Attorney General learned what had occurred, he directed the assistant attorney general to tell the grand jury of the agreement he had made with Romano's partner. Consequently, when the grand jury made its report, it did not return an indictment against Romano even though it had earlier voted to do so. When, in October of 1979, he was questioned by the press about this development, the Attorney General said, "I am not trying to suppress any indictment against Sal Romano, but I have never given my word and broken it."

The morning after the Bulletin's front-page story was published, the October 11 edition of the Providence Journal carried a front-page story in which the Attorney General was quoted as feeling "comfortable" that a new grand jury would vote to indict Romano. "I think we've got a good case—a prosecutable case," he said. He also added that Romano would be afforded the opportunity to appear before the grand jury. Romano did appear before the grand jury, and subsequently, on October 29, the grand jury returned the indictment that Romano now seeks to have dismissed.

■ As we begin our consideration of Romano's claim of prosecutorial misconduct, we would first note that the remedy he seeks, dismissal of an indictment, is an extraordinary one. To dismiss an indictment because of such misconduct means that even though a jury unanimously found a defendant guilty beyond a reasonable doubt, we would nevertheless void his conviction because the prosecution had made a misstep in obtaining a grand-jury determination of probable cause. Hence, the sanction sought is reserved for very limited and extreme circumstances. *United States v. Thibadeau,* 671 F.2d 75, 77–78 (2d Cir.1982).

■ We agree with Romano when he says his due-process rights include a guarantee of impartiality that is as applicable to grand-jury deliberations as it is to petit-jury deliberations. We said so in *State v. Jenison,* R.I., 405 A.2d 3, 7 (1979). We part company, however, when he argues that prejudice will be presumed whenever "substantial rights are imperiled by government conduct."

■ At the dismissal hearing, Romano's counsel acknowledged that he had been unable to find one case in which the appellate tribunal had upheld a dismissal of an indictment on the ground that a grand jury had been prejudiced by preindictment publicity.[3] Although this acknowledged appellate unity may have been reached in different ways, two common governing approaches can be seen. First, it has been recognized that a grand jury need not deliberate in a vacuum, totally unaware of what is happening in our society, for as Judge Harold R. Medina so aptly observed in *United States v. Nunan,* 236 F.2d 576, 593 (2d Cir.1956):

**3.** Counsel is in distinguished company. Professor Moore reports that it appears no indictment has been dismissed because of preindictment publicity regardless of its source. He points out that sanctions may be sought against an individual who "leaks" grand-jury activity to the press. 8 Moore, *Federal Practice* § 6.04(9) at 6–97, –98 (2d ed. 1982).

"[A] Grand Jury is not confined to a passive role, but may and often should proceed on its own initiative. . . . That it is induced to such action by newspaper reports forms a continuum with its historic function of ferreting out crime and corruption, and is in no way inconsistent with its duty to decide on and in accordance with the evidence adduced before it." [4]

The second universal principle is a requirement that the one seeking dismissal of the indictment prove that he has suffered actual prejudice as a result of the publicity.

As we join ranks with our colleagues who have been confronted with an attempt to dismiss indictments on the basis of prejudicial preindictment publicity, we subscribe to the sentiments expressed by the First Circuit Court of Appeals in *United States v. Brien,* 617 F.2d 299, 313 (1st Cir.1980), where the Court of Appeals ruled that no indictment would be dismissed on the grounds of prejudicial preindictment publicity unless it could be shown that the jury had failed in its sworn duty to act with impartiality. It was acknowledged that the Supreme Court in *Sheppard v. Maxwell,* 384 U.S. 333, 352–55, 86 S.Ct. 1507, 1516–18, 16 L.Ed.2d 600, 613–15 (1966), had observed that there might be circumstances in which publicity was so intense that prejudice would be assumed. However, the Court of Appeals made it clear that the remedy for possible exposure to inherently prejudicial publicity should not be the same for grand juries as it is for petit juries. The different treatment of grand and petit juries which may have been exposed to inherently prejudicial publicity, the court noted, is premised on the theory that any taint on the grand jury will be purged by the deliberations of an untainted petit jury, and if impartiality among the petit jurors is also wanting, the cure is reversal on the appellate level.

Romano, in seeking support for his dismissal motion, classifies the Attorney General's responses to the October 10 and 11, 1979 news reports about the May grand jury's failure to return an indictment as a "brief but damning comment." This classification is far from accurate. The published responses were the Attorney General's belief that the state had a "good" and "prosecutable" case against Romano and that a new grand jury would return an indictment.

In *United States v. Cederquist,* 641 F.2d 1347, 1353 (9th Cir.1981), the trial judge found prejudice because the prosecutor had conveyed to the grand jury his belief regarding the accused's guilt. On appeal, the Ninth Circuit Court of Appeals reversed, pointing out that, as a practical matter, grand juries are well aware that they are listening to evidence about a case simply because the prosecutor believes that an indictment is merited.

Here, the same may be said for the grand jury that returned the Romano indictment. It was impaneled on September 17, 1979. At that time, a Superior Court justice explained to the jurors what was expected of them and reminded them that in most instances the only evidence they would hear would be presented by the prosecution. The jurors were also asked to remember their oath, in which they solemnly promised that they would neither indict because of "envy, hatred, or malice" nor fail to indict because of "love, fear, favor, affection, or hope of reward." He also urged them to be fair to both sides and to return an indictment if they had an honest belief that there was sufficient evidence to warrant a conviction by a jury of twelve but not to bring an indictment unless "you are satisfied there is some substantial evidence to warrant the matter going before a jury."

Rhode Island's Attorney General is an elected constitutional officer, and Attorney

---

4. Similar thoughts have been expressed by this court in *In re Buxton,* 111 R.I. 480, 482, 304 A.2d 350, 352 (1973), where it was noted that our state Constitution envisions a common-law grand jury with broad powers, including the jurors' ability to investigate and act upon such matters as might come before them because of their own observations or evidence presented to them.

General Roberts, after having been targeted by banner headlines that contained an innuendo charging dereliction of duty, had a right to explain to his constituency what had happened in the spring of 1979. His confidence regarding what the future held for Romano might be classified as permissible puffery, especially since Romano was going to make a personal appearance before the jurors and attempt to convince them that he had no connection whatsoever with the Vennerbeck episode.

In finding that Romano has failed to prove the requisite prejudice, we are not unmindful of his claim that the trial justice, by his various evidentiary rulings, had effectually precluded him from establishing a factual basis from which it could be determined that the preindictment publicity was "government generated." However, the trial justice, in his rulings, made it quite clear that the significant issue was whether the preindictment publicity had prejudiced the grand jury rather than what its source and inspiration was. The position taken by the trial justice finds ample support in the views expressed by *United States v. Civella,* 648 F.2d 1167, 1174 (8th Cir.1981); *United States v. Hoffa,* 205 F.Supp. 710, 718 (S.D. Fla.1962); *United States v. Dioguardi,* 20 F.R.D. 33, 34–35 (S.D.N.Y.1956).

Romano also claims that the convening of successive grand juries to investigate the identical facts constitutes prosecutorial harassment that mandates dismissal of the indictment. He points out that in June 1977 a federal grand jury considered the Vennerbeck evidence and returned no indictments and that the same facts were considered by a Providence County grand jury in November 1978, which returned six indictments but none against him. These same facts were submitted for a third time in the spring of 1979, whereupon an indictment was voted against him but, through no fault of his, was not reported to the court. The fourth submission took place in late October 1979, and that grand jury returned the indictment that is now under attack. The reason for the federal govern-ment's involvement in the activities that took place in the Lincoln industrial complex over the 1977 Memorial Day weekend, on this record, remains a total mystery. We fail to see how keeping a promise to a defendant by allowing him to tell his side of the story to a grand jury that was considering whether or not to indict him can, by any stretch of the imagination, be considered prosecutorial harassment.

### b. The Recusal Motion

■ The initial recusal request was based upon the uncontradicted fact that the trial justice has had a long-standing friendship with the Roberts family. This relationship apparently first took root in the 1950s when the then-Governor Roberts appointed the trial justice, then a fledgling attorney, to his executive staff, first in the position of administrative assistant, then later as executive counsel. Subsequently, Governor Roberts appointed his executive counsel, now the trial justice, as a clerk and oftentimes acting judge of the Tenth District Court. It appears that at one time the Attorney General, his uncle, and the trial justice each owned shares of stock in a company that is presently supplying cable television service here in Rhode Island. At the time of trial, the trial justice's shares had been placed in a blind trust in which the trial justice and his three children are beneficiaries.

The thrust of the recusal motion was that since the Attorney General was the performer of the alleged prosecutorial misconduct, the trial justice should have withdrawn from considering the dismissal motion because he "might be, subconsciously at least, disinclined to allow the motion for reasons other than the merits of the motion." Thus, Romano also asked that the trial justice recuse himself to avoid "the appearance of partiality and/or impropriety."

The recusal motion was heard in chambers on April 16, 1980, prior to the impaneling of the petit jury. The stenographer's notes were irretrievably lost, and the parties have stipulated concerning what oc-

curred. They agree that "[a]fter a period of contemplation, Judge Gallant denied the motion. He confirmed his relationship with the Attorney General and the Roberts family, and stated he would not be anything but impartial. He felt satisfied in his own mind that he could give the defendant a fair and impartial trial, and saved the defendant's exception to his ruling, whereupon the chambers conference concluded." [5]

In support of his motion, Romano refers us to two Rhode Island cases, *State v. Nordstrom*, R.I., 408 A.2d 601 (1979), and *State v. Nunes*, 99 R.I. 1, 205 A.2d 24 (1964). Motions for mistrial in each case were granted because this court found that both Nordstrom and Nunes had proved prejudice on the part of their respective trial justices. In *Nordstrom* the trial justice had referred to the defendants as "bad bastards," and in *Nunes* the trial justice had described the defendant's acquittal on a prior indictment for rape as a "miscarriage of justice." Such comments clearly negated their impartiality, apparent as well as real, and required a new trial. *State v. Nordstrom*, R.I., 408 A.2d at 601–02.

Recently, in *State v. Clark*, R.I., 423 A.2d 1151 (1980), we upheld the trial justice's refusal to recuse himself from a case in which he was acquainted with the prosecutor even though his prior law firm had rented space to that prosecutor prior to the trial justice's appointment to the bench. In *Clark* we emphasized that a trial justice has as great an obligation not to disqualify himself when there is no reason to do so as he has to do so when the occasion does arise and that "[b]efore a judge is required to recuse in order to avoid the appearance of impropriety, facts must be elicited indicating that it is reasonable for members of the public or a litigant or counsel to question the trial justice's impartiality." *Id.* 423 A.2d at 1158.

We do not dispute Romano's contention that the trial justice's relationship with the Roberts family is more than the acquaintanceship at issue in *Clark*. However, the relationships demonstrated by this record are not of such a nature that the trial justice should have recused himself.

In a somewhat similar situation, the First Circuit Court of Appeals denied the government's petition to compel the recusal of a federal district judge who had earlier declared a mistrial of the case against the defendant, a former State Senator who had allegedly helped a former Massachusetts Governor during an investigation some years earlier. The prosecutor had argued that since it was conceded that the trial judge had had a close professional and personal relationship with the former Governor, several rulings he made during the aborted trial could lead to a conclusion that they were a result of the judge's bias. *In re United States of America*, 666 F.2d 690, 691 (1st Cir.1981). The Court of Appeals, in denying the petition for mandamus, reasoned that if recusal was ordered in this kind of case, then

"judges could hope to preside without challenge solely in communities in which they are strangers. For when a judge presides in an area where he and his family have lived for one or more generations, the numbers of people who have, directly or indirectly, helped family members, relatives, close friends, and friends of friends would form a large and indeterminate community. So also are there bound to be indefinite numbers of people who have been critical of or been on opposite sides of controversies with families, relatives, and friends. Not only would the role of judges be severely constricted by requiring disqualification under these circumstances but the result would reflect a more jaundiced view as to when there should be a reasonable doubt about a judge's impartiality than accords with the public perception." *Id.* at 697.

---

**5.** We should note that the motions for dismissal of the indictment and severance of the perjury count were also heard in chambers, and the stenographer's notes that set forth the trial justice's rationale in denying these motions were also irretrievably lost.

**754**

Indeed, in *Clark* this court took into consideration the size of Rhode Island and realized that if we were to demand recusal in cases not supported by substantial fact, then the "state's judicial system might well grind to a halt." *State v. Clark,* R.I., 423 A.2d at 1158. We are not saying that there might not be situations in which a judge, because of professional, social, or business relationships, should recuse himself in order that a trial might not have the "appearance" of impropriety; however, we are not willing to create a per se rule that a judge must necessarily recuse himself because of such relationships, and given the facts of this case, there was no need for the trial justice to recuse himself.

In reaching this conclusion, we must offer a comment on Romano's additional allegation that the relationships existing between the trial justice and the Roberts family also included a business relationship. We do not believe that the mere fact that the trial justice, the Attorney General, and his uncle each own stock in a CATV station created a business relationship that would be grounds for disqualification in the *Romano* case. There is not one shred of evidence that the total shares owned by the trio come close to a controlling interest in the business or that the trial justice's actions in the courtroom were controlled by his desire to better the return on the shares held in trust.

We do not lightly deny Romano's motion to recuse, but he has failed to persuade us that the trial justice abused the considerable discretion that was his as he balanced the need to disqualify himself to preserve the public faith in impartiality against the reasons for sitting when there was not a sufficient showing of real reason for disqualification. Further, in the circumstances of this case we would go one step further and look at the trial justice's conduct at trial to see whether or not it revealed any circumstances that might cause an observer to doubt his impartiality. The step we take is quite short because Romano's trial counsel, with commendable candor, has conceded that at the trial the trial justice at all times comported himself as an impartial arbiter should.

**c. The Composition of the Grand Jury**

■ As we continue our consideration of Romano's attempts to effectuate a dismissal of the October 1979 indictment, we are reminded that the task of a grand jury is to evaluate the law and the facts presented to it and to determine whether there is probable cause to believe that the charges brought against the accused are true so that the accused shall stand trial. *Bracy v. United States,* 435 U.S. 1301, 1303, 98 S.Ct. 1171, 1172, 55 L.Ed.2d 489, 491 (Rehnquist, Circuit Judge) (1978).

"An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397, 402–03 (1956).

■ Romano's final effort at invalidating the present indictment centers on the method used in selecting members of a grand-jury panel and relies on our holding in *State v. Jenison,* R.I., 405 A.2d 3, 8 (1979), where we held that a "jury-selection system that entirely excludes an identifiable and cognizable class playing a major role in the community, without a rational reason therefor * * * cannot be tolerated." In making this pronouncement, we were merely expressing sentiments similar to those enunciated in *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

Romano points to the provisions of G.L. 1956 (1969 Reenactment) § 9–9–1, as amended by P.L.1972, ch. 55, which require that all jury panels, grand or petit, be composed of individuals who are registered voters and who (at the time Romano was indicted) had attained the age of twenty-one. Romano argues that the exclusion of the eighteen-to-twenty-year age group and the further exclusion of the unregistered members of the community are unconstitutional. Such arguments have been heard before.

In *State v. Spivey,* 114 R.I. 43, 328 A.2d 414 (1974), this court ruled that there was no denial of rights by setting a minimum age of twenty-one for jury service and rejected the argument that the lowering of the age of majority should automatically make persons eighteen to twenty years old eligible to sit as jurors.[6] In reaching this conclusion, we had in mind the thoughts expressed in *United States v. Guzman,* 337 F.Supp. 140, 144 (S.D.N.Y.) *aff'd* 468 F.2d 1245 (2d Cir.1972), where Judge Charles H. Metzner observed:

> "There is simply no justification for defendant's claim that merely because 18-to-21-year-olds have been given the right to vote, the Constitution compels that they be given the right to serve on juries. The right to vote and the right to sit in judgment of others have certain fundamental differences which cannot be overlooked. The act of voting is a personal expression of favor or disfavor for particular policies, personalities, or laws. The voter is motivated by his personal self-interest, or what he considers best for the general populace.
>
> "However, when one sits on a jury, he is required to accept and apply the law as the judge gives it to him, whether or not he agrees with it and no matter what his personal feelings are toward the parties in question. He must have the maturity and understanding to do what may often be an unpleasant task."

Other courts have taken the position that the eighteen-to-twenty-year age group does not compose a recognizable, distinct class. *United States v. Kleifgen,* 557 F.2d 1293 (9th Cir.1977); *Welch v. State,* 237 Ga. 665, 229 S.E.2d 390 (1976). Since we believe that Judge Metzner's expression constitutes a rational basis for the determination made by the General Assembly, we see no need to determine whether persons between the ages of eighteen to twenty constitute a cognizable class within the community.

With rare exception, courts that have dealt with the challenge to the exclusion of unregistered community residents have upheld the use of voter-registration lists as a source of prospective jurors unless the lists themselves reflect discriminatory practices. *United States v. Parker,* 428 F.2d 488 (9th Cir.1970); *United States v. Gordon,* 493 F.Supp. 814 (N.D.N.Y.1980); *State v. Gretzler,* 126 Ariz. 60, 612 P.2d 1023 (1980); *State v. Daigle,* 344 So.2d 1380 (La.1977); *State v. Pittman,* 569 S.W.2d 277 (Mo.App.1978); *Commonwealth v. Edwards,* 493 Pa. 281, 426 A.2d 550 (1981); Annot., 80 A.L.R.3d 869 (1977). Here, Romano makes no claim that those charged with the responsibility of compiling voting lists engaged in any discriminatory practices against him.

In upholding the use of these lists, some courts have pointed to their convenience in providing a broad base from which to select juries. *State v. Pittman,* 569 S.W.2d at 280 (quoting *Simmons v. United States,* 406 F.2d 456, 463 (5th Cir.1969)). A more persuasive rationale, however, is expressed in *State v. Williams,* 249 S.E.2d 752, 757 (W.Va.1978), in which the court states:

> "Since exercise of the franchise and service on a jury are both duties and privileges evidencing one's desire responsibly to participate in a democratic society, we do not believe it to be erroneous to use voter registration rolls for jury selection * * * "

In our opinion, the General Assembly rationally concluded that jurors should be chosen from the lists of registered voters.

### The Severance Issue

■ Romano challenges the trial justice's refusal to sever the perjury count, claiming that such a refusal constituted an abuse of discretion which substantially prejudiced his right to a fair trial. Rule 14 of the Superior Court Rules of Criminal Procedure provides for a severance of counts when it appears that the defendant is prejudiced by the joinder of offenses. Romano argues

---

**6.** The General Assembly at its January 1980 session, by the enactment of P.L.1980, ch. 242, lowered the age for jury service from twenty-one to eighteen.

that since he was an attorney and constantly held to a higher standard of courtroom conduct, it was inconceivable that the perjury charge would not adversely affect the jury's ability to ascertain his guilt or innocence.

■ It is a well-accepted rule that severance is a question that is directed to the sound discretion of the trial justice, and the denial of such a motion will not be disturbed unless it is affirmatively shown that the defendant did in fact suffer prejudice sufficiently substantial to impinge upon his right to a fair trial. *See State v. Whitman,* R.I., 431 A.2d 1229, 1233 (1981); *State v. Patriarca,* 112 R.I. 14, 28, 308 A.2d 300, 310 (1973). Although the joinder of the perjury count with the other counts might not have been advantageous to Romano, real prejudice is something more than mere disadvantage. *State v. Sharbuno,* 120 R.I. 714, 717, 390 A.2d 915, 918 (1978); *State v. Patriarca,* 112 R.I. at 29, 308 A.2d at 311. We do not believe that the denial of the motion to sever prejudiced Romano's right to a fair trial.

Joinder of a perjury charge with other substantive charges is not an uncommon occurrence. *United States v. Isaacs,* 493 F.2d 1124, 1160 (7th Cir.1974); *United States v. Hubbard,* 474 F.Supp. 64, 87 (D.C. D.C.1979); *United States v. Mitchell,* 372 F.Supp. 1239, 1256 (S.D.N.Y.1973). In upholding such joinder, the federal courts point to Rule 8(a) of the Federal Rules of Criminal Procedure [7] and reason that when there is some commonality of proof in regard to both the perjury charge and the substantive charges, then the offenses are "connected together" for the purposes of Rule 8. *United States v. Sweig,* 441 F.2d 114, 119 (2d Cir.1971); *United States v. Isaacs, supra* at 1159.

Here, the state emphasizes that the perjurious testimony was elicited at the trial of Romano's coconspirators. This testimony concerned the events occurring during the aborted break-in that formed the basis for the first five counts of Romano's indictment. Had the trial justice severed the perjury count, the state would have been required to introduce evidence of the perjury during the trial of the first five counts and then it would have had to introduce evidence relating to those five counts during a subsequent perjury trial to demonstrate why Romano's testimony at Murphy and Barton's trial amounted to perjury. This process would result in a duplication of effort and, in essence, amount to two trials when one would suffice since the requisite commonality of proof existed. We concur with the state's position and affirm the denial of severance.

### The Sufficiency of the Evidence

In this facet of his appeal, Romano first argues that the state failed to establish the elements of the conspiracy charged. In mounting this challenge, he faults the trial justice for his denial of the motion for a judgment of acquittal on each of the five counts upon which the guilty verdicts were returned and of Romano's subsequent motion for a new trial.

a. The Motion for Judgment of Acquittal

■ The standard that is to be applied by a trial justice when considering a motion for a judgment of acquittal is firmly fixed. When ruling upon such a motion, a trial justice is to consider only that evidence that the prosecution claims is capable of generating proof beyond a reasonable doubt. Such evidence is to be viewed in the light most favorable to the state, drawing therefrom all reasonable inferences that are con-

---

**7.** Rule 8(a) of the Federal Rules of Criminal Procedure provides that

 "Joinder of Offenses and of Defendants
 (a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the

same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."
 Our corresponding Rule 8(a) is almost identical. The differences are insignificant.

sistent with the accused's guilt. At this juncture of the trial, neither the weight of the evidence nor the credibility of the witnesses is to be considered. *State v. Dionne,* R.I., 442 A.2d 876 (1981); *State v. Golden,* R.I., 430 A.2d 433, 436 (1981).

### a. 1. The Conseracy Count

■ Recently, in *State v. Ahmadjian,* R.I., 438 A.2d 1070, 1084–85 (1981), we once again emphasized that in this jurisdiction, once two or more individuals have agreed to commit an unlawful act, the crime of conspiracy is complete. No further action in furtherance of the conspiracy need occur. Thus, it is of no consequence whether the agreement is successfully or substantially effectuated. Again, in *Ahmadjian* we (1) stressed that the state had to prove the existence of the agreement and the scope of the agreement (2) acknowledged the difficulty of proving in every detail the explicit terms of such an agreement but (3) concluded that the conspirators' goals might be inferentially established by proof of the relationship, conduct, circumstances, and actions of the parties. Earlier, in *State v. Patriarca,* 112 R.I. 14, 36, 308 A.2d 300, 314 (1973), we noted with approval a trial justice's admonition to the jury that mere association with others does not constitute a conspiracy.

Romano, in alleging that there is a total failure of proof that he was a willing participant in a venture that had for its goal a successful illegal entry into Vennerbeck's plant, places particular emphasis on the conclusions reached in *United States v. Mora,* 598 F.2d 682 (1st Cir.1979), and *United States v. Tavoularis,* 515 F.2d 1070 (2d Cir.1975).

Mora was convicted of conspiring to import a controlled substance. His conviction had its inception in the airport arrest in San Juan, Puerto Rico, of a passenger arriving from Colombia with a quantity of cocaine concealed in her false-bottomed shoes. Mora admitted that he had traveled in Colombia with the passenger during the four-day period prior to her arrest in San Juan.

He did not leave South America until four days after his traveling companion had been arrested. The First Circuit Court of Appeals, in reversing the conviction and ordering a dismissal of the indictment, pointed to the lack of any evidence regarding an agreement or linking Mora in any way to the passenger's narcotics-smuggling endeavor. The record before us does not suffer from such infirmities.

Tavoularis was one of three individuals who were convicted of conspiring to possess United States treasury bills, knowing them to have been stolen from a bank. On appeal, the Second Circuit Court of Appeals reversed and directed the District Court to dismiss the indictment because the government had failed to prove an essential element of the crime charged, to wit, knowledge on the part of the conspirators that the treasury bills had been stolen from a bank. Here, however, no such "knowledge" is required.

■ The state has constantly maintained that Romano's contribution to the fruition of the conspirators' objective was his supplying of a base of operations where Fiore and company could go about their nefarious task with a minimum of risk. We shall now detail the evidence that we believe amply supports this theory.

An exhibit that was specially prepared for the Romano trial is a large-scale map of the Rolling Woods-Industrial Park portion of Lincoln. A quick glance at the map immediately informs the observer that one can leave Rolling Woods Drive, turn north onto Angell Road for a little distance and proceed northwesterly on two short stretches of highway named Jencks Hill Road and Powder Hill Road, respectively, and be within a matter of, at most, four minutes at Vennerbeck's front door. The total distance involved is just under two miles. Also depicted on the map is an electric powerline right-of-way, an area free of brush which would provide a safe, secluded means of access for anyone who might have the need to make a quick exit on foot from the Industrial Park directly to the Rolling Woods plat.

Among the witnesses presented by the state were two members of the Intelligence Unit of the Rhode Island State Police, Lieutenant Thomas E. Griffin (Griffin) and Detective Brian Andrews (Andrews). They detailed for the jury the duties they performed during the spring of 1977 as the police conducted a lengthy photographic and electronic surveillance of what was happening at Fiore's home in Johnston. An observation post had been established in an "old, broken-down" garage with a hole in its back wall which permitted the police to observe and photograph the comings and goings of those who stopped by to see Fiore. Sometime in April the FBI joined the project.

Two of the almost 200 photographs taken by the police depict Romano. One, taken on April 7, shows him with a brand-new Cadillac Seville, which ostensibly is his, at Fiore's front door. The Seville is displaying a temporary license plate. One of Fiore's visitors that day was a Vincent D'Ambra. Eight days later, on April 15, Romano was again photographed as he pulled up in front of Fiore's home in a blue Oldsmobile bearing Rhode Island license plate No. SR 400. A beep of the horn summoned Fiore, and the duo then departed. Among Fiore's visitors on this day were two Massachusetts residents, Arthur M. Barrett and his nephew, Kenneth Holmes. Holmes and Fiore were clients of Romano's.

At approximately 8:10 p.m. on May 27, Fiore was followed as he drove his Cadillac from Johnson to Providence to a Pawtucket restaurant's parking lot where he met Barrett, who was driving an Oldsmobile Cutlass registered to his girlfriend, and Ronald F. Barton, who was driving a green Pontiac. The three vehicles traveled convoy style to the parking lot of an Attleboro inn. There the Cutlass remained; but Fiore, with one passenger, and Barton, with three, traveled south on Route 95, on Smithfield Avenue, northerly on Power Road, and soon were seen in the Angell Road-Jencks Hill Road locale.

On May 29 at approximately 3:35 p.m., Fiore was again observed and photographed as he carried a single-bladed ax, a twin-bladed ax, and a blue gym bag out to his Cadillac and placed them all in the trunk. He left but returned at 5:15 p.m. On this occasion he was driving Barton's Pontiac. At this time Fiore and Barton placed three items in the Pontiac's trunk—a wrecking bar, a plastic milk case containing "some items," and a police scanner radio.

After making these observations and taking the necessary photographs, Andrews returned to the Vennerbeck plant, where he and other members of the surveillance team took up positions inside the premises. There they listened to the constant ringing of the phone and various noises emanating from outside the plant. The detail came to an end when word was received that Fiore had returned to his Johnston abode.

On Monday, May 30, Memorial Day, at about 5:30 p.m., Griffin trailed Fiore as he left his home in his Cadillac and drove to the Providence residence of Vincent D'Ambra. There he switched vehicles as D'Ambra presented him with the keys to a Dodge van that was parked in D'Ambra's driveway. Fiore and the van traveled to Pawtucket and Providence, gathering coconspirators along the way. When the Vennerbeck task force assembled in Providence in a parking lot, its automotive equipment consisted of the van, Barton's Pontiac, and Barrett's Cutlass. If the roll had been called, seven individuals would have answered "present," including Fiore, Barton, Barrett, and Kenneth Holmes. All but Fiore were residents of Massachusetts.

The break-in operation started off in high gear when the van and the Pontiac left the parking lot and headed north. In due course, the two vehicles rolled up onto the driveway in front of Romano's ranch house and attached garage. At the time the two-vehicle caravan arrived at its destination, a yellow Chevrolet registered to Romano's father was parked on the street. An inoperative silver Porsche and Romano's blue Oldsmobile were parked on the upper driveway close to the house. When the police passed by the house at about 8:30 p.m. and once

again an hour later, the position of the Romano vehicles remained unchanged, but the Cutlass now was parked on the left side of the driveway close to the street, and the van was in the middle of the driveway somewhat to the rear of the blue Olds.

The Pontiac apparently was being used to reconnoiter the area because Andrews, who maintained a surveillance position at a point near the Angell Road-Rolling Woods intersection, reported that he observed the Pontiac, with Fiore at the wheel, leave and return to the driveway on three different occasions, with the last movement made at around 10:20 p.m. Griffin reported that the van, with Fiore as its driver, also left the driveway on two different occasions and traveled north. On one occasion he observed the van stopped in an area adjacent to the industrial park "near the power lines."

The next significant incident, as the conspiratorial effort began to unravel, occurred at approximately 11:40 p.m., when word was received over the radio of Murphy's arrest by the FBI. Andrews had visited the arrest scene but quickly returned to his original position near Romano's home. Later, at about 12:55 a.m. on May 31, while on watch near Romano's home, Andrews observed an "individual" turn the corner from Angell Road onto Rolling Woods Drive. The individual "casually walked up" the driveway, opened the driver's door of the green Pontiac, leaned in, took out a black gym bag, entered the open garage doorway, and placed the bag on the garage floor. He then returned and removed a double-bladed ax, which he placed on the ground next to Romano's house. By this time Andrews recognized the individual as Barton.

Barton entered his car, closed the door, started the engine, put the headlights on, and proceeded to back down the driveway. When he got halfway onto the street, Andrews and Detective Richard Wheeler went up to the car and "yelled" at him to stop. He did. Andrews then called for assistance, and five vehicles, with their lights on, responded. The driveway scene was describ-

ed as "noisy and active" as radio transmissions filled the air.

When Andrews looked through the open doorway into the garage, he saw Barton's bag as well as a case of large six-volt batteries, one large acetylene tank, a smaller acetylene tank, and another box containing a small sledgehammer and a pipe wrench; over in the corner of the garage, standing up, were approximately three large crowbars; there was on the floor another gym bag, this one containing hoses and torch heads and other welding equipment for the acetylene tanks and torches. The jury was told that six-volt batteries play a part when one seeks to bypass a burglar-alarm system.

After the driveway arrest, the police began knocking on Romano's front door and ringing the bell. When he appeared in his bathrobe, sleepy eyed, he denied having any knowledge of the source of the various and sundry pieces of equipment found in the garage or of who owned the van, the Pontiac, and the Cutlass. There was testimony, however, indicating that before Romano responded to the knocking on the door and the ringing of the bell, police had observed "movement" behind one of the front windows. Again, in cross-examination, Andrews testified that when he returned from the Murphy arrest site to Romano's neighborhood and took up a position close to the Romano home, he could hear through the stillness of the night the sound of a police scanner in operation.

The evidence to which we have just alluded, when looked at in the light most favorable to the state, gives rise to a reasonable conclusion that Romano's relationship with Fiore went far beyond that of lawyer-client and that Romano was a willing participant in the plan to break into Vennerbeck's plant and share with Fiore and his six companions the anticipated $1 million proceeds. The manner in which the van and the Pontiac on the evening of May 30 rolled into Romano's driveway and the positions in which the Romano vehicles were parked gave every indication that the attorney was well aware of what was scheduled to take

place at the industrial park. The yellow Chevrolet, which Romano by his own admission had used to attend a wake in Providence that evening, was parked on the street to the side of the driveway. Its position and the positions of the Porsche and the Olds proved another indication that an invisible welcome mat was out, inviting the passengers and operators of the van, the Pontiac, and the Cutlass to "come on in" and get to work. If Griffin and Andrews are believed, the testimony regarding the position of the yellow Chevrolet would indicate that Attorney Romano was home when the van and the Pontiac first arrived at his house. Griffin estimated that the initial arrival occurred at about 8 p.m.

The comings and goings of the van and the Pontiac as Fiore went about his business during the evening should, it seems obvious, have made the occupants of the ranch house aware that something out of the ordinary was going on. Most homeowners who would come across strange vehicles parked in their driveways (especially a Cutlass and a Pontiac bearing Massachusetts plates as well as a van truck) would immediately begin to wonder what was going on and at some point attempt to obtain some assistance by calling the police.

It is also reasonable to believe, after considering the size of the cache of burglary tools resting on the garage floor, that they were placed there at a time when the relationship between Fiore and Romano was conspiratorial rather than fiducial.

The casual manner in which Barton made his postmidnight approach to Romano's driveway and the open garage provide further evidence that Romano was affording a safe haven to his fellow conspirators. According to the police, there was nothing secretive about the manner in which he approached the driveway or entered the garage.

The movement at the front window and the sound of the police scanner are further pieces of a mosaic that, when looked upon in its entirety, tells a reasonable person that Romano was a willing participant in the Vennerbeck break-in. The trial justice's denial of the motion for judgment of acquittal on the conspiracy count was well warranted.

#### a. 2. The Destruction-of-Communication-Lines and Receipt-of-Stolen-Goods Counts

Romano's argument relative to a judgment of acquittal on the counts relating to the destruction of Vennerbeck's telephone lines and the receipt of stolen walkie-talkies merits little response. He claims that the so-called *Pinkerton* rule, which was endorsed in the Barton-Murphy opinion, is applicable only when the conspirator has participated in the substantive crime that gave rise to the conspiracy. In *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), the Supreme Court ruled that in a conspiracy situation, a criminal act by one partner in furtherance of the conspiracy may be attributed to all partners in the conspiracy without the necessity of a new agreement so long as the act could be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.

When we published the *Barton* opinion, we were aware of the criticism directed at the *Pinkerton* rule but went on to express the belief that the rule was sound and viable. *See State v. Barton,* R.I., 424 A.2d 1033, 1036–38 (1981). We remain of the same mind.

In light of *Pinkerton,* the sole issue concerning the dismissal of the two counts now under review becomes whether or not the damaging of the telephone lines and the possession of the stolen radios could be considered the natural or foreseeable consequences of the Vennerbeck break-in conspiracy. Although there was no evidence of a specific agreement to commit these particular crimes, they are clearly foreseeable in light of the underlying offense of breaking and entering with intent to commit larceny. The destruction of phone lines occurred in the manhole outside Vennerbeck's plant on the evening of May 29 as some of the conspirators were down there equipped with a telephone repair-person's handset,

attempting to locate the two "wires" that served the plant's burglar-alarm system,[8] a necessary task for successfully breaking into and entering a building such as Vennerbeck's. The stolen radios, most of which were found during the daylight hours of May 31 in and about the plant, allowed the conspirators to communicate with one another from their various strategic positions. As indicated early on in this opinion, Murphy met the FBI because he had been told by radio, "[W]e've got a problem here. Go back." Since each of the substantive counts alleges actions in furtherance of the overall conspiracy and Romano was part of the conspiracy, his convictions in regard to those violations are affirmed.

### a. 3. The Perjury Count

 To put the perjury-count controversy in its proper context, we shall briefly refer to the testimony given by Romano in February 1979 when he appeared as a prosecution witness at the trial of Barton, Barrett, and Murphy. Romano told the jury that on the evening of May 30, 1977, he attended a wake in Providence. He could not remember the exact time he returned home but estimated that it was sometime "[between] 7:30, 8 o'clock." He was asked, "And, now, when you arrived home, did you notice any vehicles in your driveway that you did not know were going to be there?" He replied, "Oh, yes. Yes." He identified the vehicles as a light-colored van and a "General Motors car * * * a Chevrolet or an Oldsmobile. * * * I believe it had a Massachusetts plate on it." He was then asked, "Did you expect to see those two vehicles in your driveway when you returned home?" The answer was, "No."

Romano, after reminding us that our perjury statute, G.L.1956 (1981 Reenactment) § 11–33–1, requires proof of a willful falsehood, contends that the questions concerning his lack of knowledge of his expectations in regard to the presence of the van

and the Pontiac upon his return from the wake were phrased in such a manner that his responses could not be considered lies. He argues that inquiries regarding his expectations delved into his state of mind and that his answers "could have" been based upon an expectation that he would see vehicles other than the van and the Pontiac and that he would see such vehicles at a time other than the hour when he returned home.

In making this argument, Romano relies upon *Bronston v. United States,* 409 U.S. 352, 360–62, 93 S.Ct. 595, 601–02, 34 L.Ed.2d 568, 575–76 (1973), where the Supreme Court emphasized that "[t]he burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry" and that "[p]recise questioning is imperative as a predicate for the offense of perjury." Those statements can no more be applied out of context, however, than can Romano's words be assayed for falsity out of the context in which they were spoken. In *Bronston* the defendant had answered in the negative the question regarding whether he had at that time any bank accounts in Swiss banks. To the next question, "Have you ever?" his answer was, "The company had an account there for about six months, in Zurich." The answer was literally true but did not reveal that Bronston had himself maintained a Swiss bank account in the past although he did not have such an account at the time he was questioned. The Supreme Court held that the federal perjury statute did not reach a nonresponsive answer that, as far as it went, was literally true. *Bronston* was concerned with a situation in which the declarative statement that was made was literally true regardless of the question asked rather than a situation in which a yes or no answer was given, the truth of which could only be ascertained by referring to the context in

---

**8.** Earlier in this opinion we alluded to the May 29 stakeout within Vennerbeck & Clase, Inc. and the continuous ringing of the plant's phones. The persistent ringing was caused by the handset operator as he clipped one pair of

wires after another and dialed, looking for the one pair which would not emit a ringing signal—such a pair would be attached to the alarm system.

which the question was asked. *United States v. Caucci,* 635 F.2d 441, 445 (5th Cir.1981).

Since we are still dealing with the sufficiency of the evidence, we are bound to view the evidence and all inferences that reasonably may be drawn therefrom in the light most favorable to the state. The "could have" language Romano posits before us overlooks the context in which he was asked about his expectations as they related to the two vehicles that he found parked in his driveway after paying his respects to the deceased's family. There was nothing obtuse about the prosecutor's questioning. His questions were simple and direct. At no time did Romano hesitate or say that he was expecting someone other than Barton or Fiore to drop by later in the evening. Instead, he insisted that having strange cars in his driveway was a routine situation, for it was not unusual at that point in his career for clients to make an after-office-hours visit to his home. In fact, he told the jury that on the evening of May 30 he had waited up until ten o'clock for the unknown clients and then at that hour retired for the evening. We conclude that the record amply supports a reasonable inference that Romano's responses concerning his expectations concerning what he would see on his premises upon his return from the wake were patent falsehoods.

b. The Motion for New Trial

■ Romano bases his claim of error in the trial justice's denial of his motion for a new trial on two points. He first argues that the evidence was misconceived and did not support the verdict. In order to prevail on this issue, a defendant must prove that the trial justice, in reviewing the evidence, overlooked or misconceived material evidence or was otherwise clearly wrong. *State v. Jefferson,* 116 R.I. 124, 130, 353 A.2d 190, 194 (1976). Unlike the standard applied in a motion for judgment of acquittal, when faced with a new-trial motion, the trial justice considers all the evidence, weighs it, takes into account the credibility of witnesses, and considers the evidence in

the light of the charge given to the jury. *State v. McAssey,* R.I., 432 A.2d 683, 685 (1981).

■ In ruling on a motion for a new trial, a trial justice should articulate the facts upon which the ruling is based. In this way, on appeal, the reviewing court can determine whether material evidence has been misconceived or the ruling was clearly wrong. *State v. Benevides,* R.I., 425 A.2d 77, 81 (1981); *State v. Barnes,* R.I., 409 A.2d 988, 992 (1979).

■ Immediately after the prosecution rested, Romano presented his defense. A twenty-four-year-old roofer told the jury that on May 30, 1977, he was working as Romano's weekend landscaper. His specialty was cutting grass and weeding flower beds. He was working when Romano returned from the wake, and Romano drove him home.

As part of the job, the landscaper had dumped the weeds into a trash can situated in the garage. He testified that as far as he was concerned, the garage floor was clear of anything later seen by the State Police. He did not remember any vehicles, such as the van or the Pontiac, being on the driveway. He conceded that Romano had represented him and "once in a while charged him." He also admitted that he had told the State Police that he would "call on Sal" whenever he needed money.

One of the defense exhibits is a booklet furnished to a deceased's family by the Providence funeral home where Romano attended the wake to which we alluded earlier. The booklet contains the signatures of those individuals who appeared at the funeral home to express to the bereaved a personal word of condolence. Listed on the first page entitled "Relatives and Friends" is Romano's signature.

Romano, in his testimony, insisted that all his dealings with Fiore and Kenneth Holmes were strictly professional. He also maintained that he had no idea about the ownership of the van and the Pontiac. The presence of the vehicles posed no concern to

him since clients often stopped by his house at times other than the usual nine-to-five time frame. Romano's professional integrity was somewhat tarnished when on cross-examination it was revealed that the registration SR 400 that was attached to a blue Oldsmobile had been issued for a 1965 red Oldsmobile sedan that he had disposed of two years earlier.

The trial justice in this case, in denying the motion for a new trial, gave a very discursive opinion in which he demonstrated his awareness of what was expected of him when considering Romano's motion. He points to numerous pieces of evidence which, when taken together, form a basis for the guilty verdict. Among other factors, he discusses the comings and goings of the conspirators' vehicles and the use of Romano driveway as the point of their return, the failure of Romano to call the police upon seeing several strange vehicles in and around his driveway, his failure to appear during Barton's arrest when there was much commotion, the casual manner in which Barton placed burglary tools inside Romano's garage, and, finally, the proximity of Romano's home to the plant and the power lines that run by Vennerbeck & Clase.

It is obvious that the trial justice, as did the jury, believed the witnesses presented by the state and discounted the testimony presented by the defense. His exhaustive summary convinces us that he neither misconceived nor overlooked any material evidence, nor was he clearly wrong.

Romano would have us construe the evidence in such a way that the state's entire case crumbles because Romano was acquitted in the possession-of-burglary-tools count. To assert this as the basis for his new-trial motion is misguided. The trial justice expressly points out in his ruling that even apart from Romano's knowledge of the burglary tools, other evidence presented at trial was sufficient to show complicity in the conspiracy. As noted above, his discussion of that evidence shows this point to be true.

█ Also connected with his claim of error regarding the sufficiency of the evidence, Romano argues that the trial justice should have applied the so-called *Montella* rule. This rule required that in order to uphold a conviction based solely on circumstantial evidence, the jury must be instructed that the evidence must not only be consistent with the hypothesis of guilt but must also be inconsistent with any reasonable hypothesis of innocence. *State v. Montella*, 88 R.I. 469, 149 A.2d 919 (1959). This rule was expressly rejected in *State v. Roddy*, R.I., 401 A.2d 23 (1979). Romano would have the abandonment of this rule relate only to jury instructions. He claims that a trial justice is still required to apply it in ruling on a motion for a new trial. There is no merit to this contention.

Concededly, we abandoned the *Montella* rule because "an additional instruction on circumstantial evidence is confusing and incorrect." *State v. Roddy*, R.I., 401 A.2d at 35. Although part of the problem with the rule was juror confusion, we did emphasize that a distinction between direct and circumstantial evidence was unnecessary since "the probative values of direct and circumstantial evidence are similar." *Id.* The intent of the court was therefore to reject the rule in its entirety, not only as it applied to jury instructions. We expressed similar sentiments in *State v. Proulx*, R.I., 419 A.2d 835, 841 n. 4 (1980). Thus, we cannot fault the trial justice's refusal to invoke *Montella*.

█ Romano also claims that he is entitled to a new trial because the jury returned inconsistent verdicts. He argues that since the crucial element in proving his involvement as a conspirator was the breaking-and-entering paraphernalia found in his garage, the conspiracy count must fall in light of the not-guilty verdict on the possession-of-burglary-tools count; and with the collapse of the conspiracy count, the *Pinkerton* and perjury offenses also become negated.

Whenever we have considered the issue of verdict inconsistency, we have subscribed to the sentiments expressed in *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356, 358–59 (1932), where Justice Holmes observed that verdict consistency is not sine qua non because each count of an indictment is to be considered as a separate verdict. In *State v. Leonardo,* 119 R.I. 7, 13, 375 A.2d 1388, 1390 (1977), and *State v. Eckhart,* 117 R.I. 431, 439, 367 A.2d 1073, 1077 (1977), we recognized that logically inconsistent jury verdicts will be upheld as long as the verdicts are legally consistent. As we have emphasized in the past, a jury must be afforded broad power to arrive at inconsistent verdicts of acquittal and conviction through its traditional power to compromise, whether the compromise reached is motivated by a desire to show leniency or by some other consideration. Again, in *State v. Ciulla,* 115 R.I. 558, 575, 351 A.2d 580, 589 (1976), where a contention somewhat similar to the one now being pressed by Romano was rejected, we commented on the inherent right of a common-law jury to return a not-guilty verdict despite overwhelming evidence of guilt.

Here, the guilty verdict on the conspiracy count and the not-guilty verdict on the burglary-tools count are legally consistent because each count embraces a separate and distinct crime. The conspiracy charge required proof of an agreement by two or more persons to break into and enter the Vennerbeck premises during the nighttime with the intent to commit larceny therein. The burglary-tools count required proof of a conscious possession by Romano of the garage-floor hardware, knowing of its potential use as a burglar's tools.

As the trial justice so aptly pointed out, putting aside the garage-floor collection of tanks, crowbars, bags, and batteries, there was ample other evidence that points to and substantiates Romano's complicity in the breaking-and-entering episode. Consequently, we hold that the jurors' acquittal of Romano on the possession-of-burglary-tools count did not preclude a concurrent finding of guilt in regard to the conspiracy count.

### The Charge to the Jury

On April 30, 1980, the trial justice charged the jury. At that time, Romano's counsel, when objecting to the trial justice's definition of "reasonable doubt," listed three grounds: (1) the brevity of the definition, estimating that it consisted of "two sentences"; (2) the failure, when defining "reasonable doubt," to point out to the jury that a conviction could not be based upon "conjecture, speculation, or surmise", and (3) the error made when "you equated reasonable doubt to common sense." On the next day, May 1, 1980, the jury returned to the courtroom at approximately 4:50 p.m. and asked that the trial justice repeat his instructions relative to the conspiracy charge. After the trial justice had complied with the jury's request, Romano's counsel lodged additional objections which are not relevant to this facet of the appeal.

However, on appeal he lodges further objections to the "reasonable doubt" portion of the charge. The trial justice is now being faulted for equating "reasonable" doubt with an "actual" doubt. This objection comes about from observations made in *State v. Thorpe,* R.I., 429 A.2d 785, 790 n. 4 (1981), where we expressed disapproval of the practice of equating the term "reasonable doubt" with the phrase "substantial doubt" and ruled that *hereafter* trial justices, when defining the term "reasonable doubt," should avoid the use of the term "substantial." Later, in *State v. Ballard,* R.I., 439 A.2d 1375 (1982), we refused to apply the *Thorpe* prohibition to a trial that took place prior to the issuance of our opinion, and we take the same position here.

Other objections listed in Romano's brief which were not made at trial include such contentions as the trial justice's failure to inform the jury of the state's "heavy burden of proof" or to remind the jury that all doubts are to be resolved in favor of Romano. We shall consider neither contention because of Romano's failure to comply

with Super.R.Crim.P. 30 and its requirement that a party objecting to the charge must inform the trial justice in clear and distinct language the matter in regard to which objection is being lodged and the grounds for such objection; otherwise, the objection will not be considered on appeal. *State v. Giordano,* R.I., 413 A.2d 93 (1980).

In determining the validity of a challenge to a charge given to the jury, we look at the entire charge, which in the case at bar encompasses twenty-eight pages of the transcript. As he began his instruction, the trial justice explained to the jury the grand-jury process and admonished the jury that the return of an indictment had no evidentiary value whatsoever. He then referred to the presumption of innocence and stressed that it remained with Romano throughout the trial and until such time as the individual jurors were convinced of his guilt beyond a reasonable doubt. The jury was also told that the burden of proving Romano's guilt beyond a reasonable doubt remained with the state and never shifted to the defense.

In explaining the elements of a conspiracy, the jurors were instructed that mere suspicion, speculation, or associating with others could not establish the conspiracy and that a conspiracy charge could not be sustained unless the jury was convinced beyond a reasonable doubt that Romano was a "willing participant" in the criminal enterprise. The trial justice then went on to explain to the jury the constituent elements of the remaining counts.

After completing this facet of the charge, he explained to the jury the meaning of "reasonable doubt." "Reasonable doubt," he said, "means just what those two words ought to mean as you think of their common meaning. Reasonable doubt is not a fanciful doubt nor a mere possible doubt. Reasonable doubt is an actual, substantial doubt arising from the evidence or the lack of evidence."

As he neared the conclusion of his charge, the trial justice reminded the jurors that once they appeared at the courthouse prepared to perform their civic duties, they were expected not to have left their common sense at home.

"Use your common sense in considering this case and do not be swayed by sympathy, bias, prejudice or any other improper sentiment or motive. * * * Deal with this case honestly and courageously. Do not hesitate if your verdict be guilty on any or all of these counts to say so. But with equal force, if your verdict be not guilty on any or all of these counts do not hesitate to say so. Return a verdict, ladies and gentlemen, that will be in accordance with the facts and in accordance with the law as I gave it to you in these instructions. But above all, when you return to court following your deliberations, return verdicts that will satisfy the dictates of your own consciences."

We cannot fault the trial justice for instructing the jury on the law as it existed at the time of trial. In our opinion, he correctly and fairly defined the law pertinent to the definition of "proof beyond a reasonable doubt." We would also endorse his refusal to charge in terms of the *Montella* rule and would merely refer the reader to the comments expressed earlier in this opinion.

The defendant's appeal is denied and dismissed, and the judgments of conviction appealed from are affirmed.